# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

STATE OF TEXAS,

        *Plaintiff*,

v.

XAVIER BECERRA, Secretary of the United States
Department of Health and Human Services, in
his official capacity; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; JEFF HILD, Principal Deputy Assistant
Secretary for the Administration for Children
and Families; ADMINISTRATION FOR CHILDREN
AND FAMILIES; REBECCA JONES GASTON,
Commissioner of the Administration on
Children, Youth and Families, and Acting
Associate Commissioner of the Children's
Bureau, in her official capacity;
ADMINISTRATION ON CHILDREN, YOUTH AND
FAMILIES; CHILDREN'S BUREAU; and the
UNITED STATES OF AMERICA,

        *Defendants*.

CIVIL ACTION NO.   6:24-cv-00348

---

# COMPLAINT

---

1.     The Biden Administration is trying to shoehorn gender identity into the statutes
governing our Nation's foster care system by requiring States like Texas to provide special
treatment and special placements for so-called "LGBTQI+"[1] youth. Under a broad new rule,
Title IV-E and Title IV-B agencies must ensure that a foster-care placement that affirms a child's
LGBTQI+ status is available for, and may be requested by, any child in foster care who so identifies

---

[1] To avoid confusion, Texas uses the language of the Final Rule, which uses "LGBTQI+"
and similar euphemisms to refer to individuals who identify themselves based on the contested
metaphysical concepts of sexual orientation or gender identity.

and must enforce a new prohibition on "retaliation" against "LGBTQI+" foster children. Dep't of Health & Hum. Servs., *Designated Placement Requirements Under Titles IV–E and IV–B for LGBTQI+ Children*, 89 Fed. Reg. 34,818–19 (April 30, 2024) (to be codified at 45 C.F.R pt. 1,355) (the Final Rule).

2.      This Final Rule exacerbates a growing shortage of foster care providers by compelling states to recruit new providers to comply with the Rule. The Final Rule itself understood this proverbial gun-to-the-head when it "anticipate[d] that a majority of states and tribes would need to expand their efforts to recruit and identify providers and foster families that the state or tribe could identify as Designated Placements for LGBTQI+ children." 89 Fed. Reg. 34,854.

3.      The Final Rule imposes its new requirements without any statutory basis. Title IV does not address sexual orientation or gender identity, nor does it require special accommodations for those categories. Title IV's anti-discrimination provisions do not include protections for sex, much less the derivative categories of gender identity and sexual orientation. Accordingly, the Final Rule is unlawful and violates the Constitution, and the Court should declare it unlawful, set it aside (*i.e.*, vacate it), and enjoin its implementation.

## PARTIES

4.      Plaintiff the State of Texas is a free and independent state, subject only to the Constitution of the United States. Tex. Const. art. I, § 1. Texas has the authority and responsibility to protect the health, safety, and welfare of its residents. *See, e.g.*, *Texas v. Richards*, 301 S.W.2d 597, 602 (Tex. 1957) ("As a general rule the [police] power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience"); *Lombardo v. Dallas*, 73 S.W.2d 475, 479 (Tex. 1934) ("[T]he police power of a state embraces regulations designed to promote the public health, the public morals, or the public safety."). This includes the authority to protect and, when necessary, care for the children of Texas. *See* Tex. Fam. Code §§ 262.001–.417.

5.      Defendants are appointed officials of the United States government, a United States agency and its components responsible for the issuance and implementation of the challenged regulation, and the United States.

6.      Defendant Xavier Becerra is the Secretary of the United States Department of Health and Human Services (HHS). He is sued in his official capacity.

7.      Defendant HHS is one of the agencies that promulgated and now enforces the challenged regulation.

8.      Defendant Jeff Hild is the Principal Deputy Assistant Secretary for the Administration for Children and Families. He is sued in his official capacity.

9.      Defendant the Administration for Children and Families (ACF) is a division of HHS. ACF is one of the agencies that promulgated and now enforces the challenged regulation.

10.     Defendant Rebecca Jones Gaston is the Commissioner of the Administration on Children, Youth and Families (ACYF), and the Acting Associate Commissioner of the Children's Bureau (CB). She is sued in her official capacity.

11.     Defendant ACYF is an agency within ACF. ACYF one of the agencies that promulgated and now enforces the challenged regulation.

12.     Defendant CB is one of the divisions within the ACYF. CB is another agency that promulgated and now enforces the challenged regulation.

13.     Defendant the United States of America is sued under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

### JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 702–703.

15.     The Court is authorized to award the requested declaratory relief under 5 U.S.C. §§ 702, 703, and 706 and 28 U.S.C. §§ 2201–2202, and the Court's inherent equitable powers.

16.     The Court is authorized to award injunctive relief under 28 U.S.C. § 1361.

17.     Texas is "entitled to judicial review" under 5 U.S.C. § 702.

18.     Venue lies in this district under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a defendant, and because Texas resides in every judicial district and division within its borders, including this one. *See, e.g.*, *Daily Wire, LLC v. United States Dep't of State*, No. 6:23-CV-609, 2024 WL 2022294, at *14 (E.D. Tex. May 7, 2024) (Kernodle, J.); *see also Utah v. Walsh*, 2:23-cv-16-Z, 2023 WL 2663256, at *3 (N.D. Tex. Mar. 28, 2023) (Kacsmaryk, J.) ("Texas resides everywhere in Texas.").

BACKGROUND

## I.    Foster Care in Texas

19.     Foster care is an important tool for children who cannot live safely at home and who have no next of kin or other appropriate individual willing and able to care for them.

20.     When a child is in that situation, the Texas Department of Family and Protective Services (DFPS)—the agency that administers foster care in Texas—tries to identify relatives or friends who are willing and able to care for that child. But if DFPS cannot find an appropriate relative or friend, the child will be placed in foster care.

21.     A child in foster care might live in a foster family home, a foster family group home, a residential group care facility, or a facility overseen by another state agency.

22.     DFPS spends a considerable amount on residential childcare, casework services, and placement services as part of Texas's foster care system.

23.     To administer foster care in Texas, DFPS uses the new Community-Based Care (CBC) system. Under this system, DFPS contracts with a Single Source Continuum Contractor (SSCC) in each of several geographic service areas.

24.     The SSCC is responsible for finding foster homes or other living arrangements for foster children in its geographic service area, and it will often rely on child placement agencies to find homes for children in its area. Every SSCC that operates in Texas relies on child placement agencies to find suitable homes for the foster children in its care.

25.     The regulation of child placement agencies is shared by DFPS and the Texas Department of Health and Human Services (HHSC). HHSC sets many requirements for child placement agencies through formal rulemaking.

26.     Several of HHSC's requirements for child placement agencies impose sex-specific obligations.

27.     For example, when a child placement agency houses children in its care, it may not allow unrelated children "six years old or older . . . to share a bedroom with a child of the opposite gender" unless the placement agency takes certain defined steps to ensure that opposite gender charges can be housed together without risking inappropriate contact. 26 Tex. Admin. Code § 749.3029 (2022) (Health & Hum. Servs., Foster Homes: Health & Safety Requirements, Env't, Space, and Equipment).

28.     Similarly, HHSC requires any searches of foster children aged five years or older involving "the removal of clothing" be witnessed by "an adult of the same gender." *Id.* at § 749.1015(e) (2007) (Health & Hum. Servs., Children's Rights).

29.     Title 26 of the Texas Administrative Code uses the terms "gender" and "sex" interchangeably. Accordingly, HHSC's "gender"-specific requirements refer to the sex of foster care charges or other individuals.

30.     Properly addressing foster care in Texas requires the help of many child placement agencies, and having a diverse network of child placement agencies helps DFPS fulfill its foster care mission. Accordingly, Texas has taken steps to ensure that it can contract with many different child placement agencies to find loving homes for children.

31.     In particular, a number of faith-based providers in Texas receive Title IV-E funding through DFPS to provide their services. Some of these providers require potential foster care or

adoptive parents to share a religious faith or agree to the provider's statement of faith. Some have particular religious views on marriage, gender identity, and sexual orientation.[2]

## II.    Title IV-E Funding for Foster Care

32.    Federal funding for foster care is governed by Title IV-E of the Social Security Act, which is codified at 42 U.S.C. §§ 670–679c. Title IV-E provides grants to States for foster care, transitional independent living programs, adoption assistance, and kinship guardianship assistance, among other things. 42 U.S.C. § 670. Title IV-E operates through "the conditional grant of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). ACF is the agency that distributes Title IV-E funds to States for foster-care and adoption assistance. 42 U.S.C. § 670.

33.    HHS administers Title IV-E at the federal level. DFPS administers Title IV-E grants at the state level.

34.    DFPS receives approximately $368,772,531 per year in Title IV-E funding. And DFPS spends considerably to support casework services for children in foster care, residential childcare services, and placement services.

35.    Generally, to be eligible for payment under Title IV-E, a State must submit a plan to the Secretary of HHS for approval. *See* 42 U.S.C. § 671(a).

36.    Title IV-E lists requirements for state plans in 42 U.S.C. § 671(a).

37.    For instance, Title IV-E contains an express anti-discrimination provision that requires state plans to prohibit discrimination on the basis of "race, color, or national origin":

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which— . . . (18) not later than January 1, 1997, provides that neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may— (A) deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the person, or of the child,

---

[2] A list of these providers is located on the DFPS website. *See* http://www.dfps.state.tx.us/ Adoption_and_Foster_Care/Adoption_Partners/private.asp (last visited September 24, 2024). The particular requirements of each provider may be determined by clicking on a provider's name and accessing that provider's website.

> involved; or (B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.

42 U.S.C. § 671(a).

38.     Title IV-E also contains an express anti-discrimination provision concerning out-of-jurisdiction adoptions:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which— . . . (23) provides that the State shall not— (A) deny or delay the placement of a child for adoption when an approved family is available outside of the jurisdiction with responsibility for handling the case of the child.

42 U.S.C. § 671(a)(23).

39.     The scope of such anti-discrimination provisions reflects Congress's deliberate choice. Conspicuously absent is a prohibition on sex-based discrimination, much less that based on sexual orientation or gender identity. In fact, the scope of Title IV-E's anti-discrimination provisions differs from a similar anti-discrimination provision in Title IV-A, which prohibits different kinds of discrimination, including age and disability discrimination. 42 U.S.C. § 608(d); *see also* 42 U.S.C. § 603(a)(5)(I)(iii) (prohibiting sex discrimination in some contexts).

40.     To enforce these anti-discrimination provisions under Title IV-E, Congress created a detailed remedial scheme. 42 U.S.C. § 674(d).

41.     When a State violates the statutory anti-discrimination requirements, HHS reduces the State's funding for that fiscal quarter. That funding is reduced by amounts that vary from two percent to five percent, depending on the number of violations in that fiscal year. *Id.* § 674(d)(1)(A)–(C). This provision reflects Congress's determination about the appropriate incentives to give States. *Cf. Dole*, 483 U.S. at 211 (finding conditional spending legislation not coercive because "all [the State] would lose . . . is 5% of the funds otherwise obtainable under specified highway grant programs").

42.     A non-state entity that violates the statutory anti-discrimination requirements must return all of the state funding it received that quarter. 42 U.S.C. § 674(d)(2).

43.     Both States and non-state entities can face private lawsuits from individuals "aggrieved by a violation of" the statutory anti-discrimination provision concerning race, color, or national origin. 42 U.S.C. § 674(d)(3).

44.     The scope of these enforcement provisions reflects Congress's deliberate choice. Congress could have chosen to enforce anti-discrimination requirements in a different way, but it did not. Likewise, Congress could have granted HHS more tools to compel state behavior than the penalty provisions.

45.     In contrast to these enforcement mechanisms, when a state plan complies with section 671(a), the Secretary must approve it. The Secretary does not have discretion to deny approval of any state plan that complies with § 671(a). *Id.* § 671(b) ("The Secretary shall approve any plan which complies with the provisions of subsection (a) of this section."); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007) (explaining that a statutory directive that an agency "shall approve" a state submission upon certain conditions "is mandatory" if the conditions are met and there is no contrary statute); *Luminant Generation Co. v. EPA*, 675 F.3d 917, 926 (5th Cir. 2012).

46.     Likewise, HHS must make payments to States with approved plans. HHS does not have discretion to deny payments to States with approved plans. *See* 42 U.S.C. § 674(a) ("For each quarter beginning after September 30, 1980, each state which has a plan approved under this part shall be entitled to a payment").

47.     Under this system, Congress limits the Secretary's ability to create new incentives for States by requiring the Secretary to approve plans and make payments when a State satisfies section 671(a).

**III.    The Final Rule**

48.     On April 30, 2024, HHS promulgated the Final Rule, which went into effect on July 1, 2024, and which requires Title IV-E and IV-B agencies to implement its provisions by October 1, 2026. *See Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+ Children*, 89 Fed. Reg. 34,818 (April 30, 2024).

49.     The Final Rule contains several relevant substantive provisions and procedural provisions. Consider first the substantive provisions, which may be divided into the following categories: (1) additional designated placements, (2) decisions about placements and services, (3) retaliation against LGBTQI+ children, and (4) access to services that affirm a child's LGBTQI+ status or identify.

50.     *First*, regarding additional designated placements, the Final Rule generally requires Title IV–E and Title IV–B agencies to ensure that "there is a Designated Placement available for all LGBTQI+ children in foster care who request or would benefit from such a placement." 89 Fed. Reg. at 34,859 (codified at 45 C.F.R. § 1355.22(b)(1)).

51.     For a placement to be "designated" for LGBTQI+ children, the provider must (1) "commit to establishing an environment that supports the child's LGBTQI+ status or identity;" (2) "be trained with the appropriate knowledge and skills to provide for the needs of the child related to the child's self-identified sexual orientation, gender identity, and gender expression;" and (3) "facilitate the child's access to age- or developmentally appropriate resources, services, and activities that support their health and well-being." *Id.* (codified at 45 C.F.R. § 1355.22(b)(1)(i)–(iii)).

52.     *Second*, the Final Rule regulates the decisions agencies make about placements and services. Specifically, when an agency makes placement and service decisions related to an LGBTQI+ child, it must give "substantial weight to the child's expressed concerns or requests when determining the child's best interests." 89 Fed. Reg. at 34,860 (codified at 45 C.F.R. § 1355.22(b)(3)).

53.     The agency must offer the child a placement "consistent with their gender identity," and it must also consult with the child to provide an opportunity to voice any concerns related to placement. *Id.* (codified at 45 C.F.R. § 1355.22(f)). And when an LGBTQI+ child requests a designated placement, an agency must consider whether additional services and training would allow the current provider to meet the conditions for a Designated Placement before initiating any placement changes. *Id.* (codified at 45 C.F.R. § 1355.22(b)(3)). And if the current

provider is willing to meet the requirements to be a designated placement, the agency must use the case review system to regularly review that provider's progress in meeting those requirements. *Id.*

54.     *Third*, the Final Rule obligates agencies to provide LGBTQI+ services to LGBTQI+ children. Specifically, agencies must "ensure that LGBTQI+ children have access to age- or developmentally appropriate services that are supportive of their sexual orientation and gender identity or expression, including clinically appropriate mental and behavioral health supports." *Id.* (codified at 45 C.F.R. § 1355.22(e)).

55.     *Fourth*, the Final Rule addresses retaliation against LGBTQI+ children. Generally, under the Final Rule's retaliation provision, an agency must implement a procedure to ensure that no agency, provider, or any entity or person acting on behalf of the agency or provider "retaliates against an LGBTQI+ child in foster care based on the child's actual or perceived LGBTQI+ status or identity, any disclosure of that status or identity by the child or a third party, or the child's request or report related to the requirements for placements or services . . . ." *Id.* (codified at 45 C.F.R. § 1355.22(d)(1)).

56.     The Final Rule defines "retaliation" broadly to include:

(i) [h]arassment, mistreatment, or abuse . . . ; (ii) [a]ttempts to undermine, suppress, change, or stigmatize a child's sexual orientation or gender identity or expression through "conversion therapy;" (iii) [u]nwarranted placement changes, including unwarranted placements in congregate care facilities, or restricting an LGBTQI+ child's access to LGBTQI+ peers, siblings, family members, or age- or developmentally appropriate materials and community resources; (iv) [d]isclosing the child's LGBTQI+ status or identity in ways that cause harm or risk the privacy of the child or that infringe on any privacy rights of the child; (v) [u]sing information about the child's LGBTQI+ status or identity to initiate or sustain a child protection investigation or disclosing information about the child's LGBTQI+ status or identity to law enforcement in any manner not permitted by law; or (6) [t]aking action against current or potential caregivers (including foster parents, pre-adoptive parents, adoptive parents, kin caregivers and birth families) because they support or have supported a child's LGBTQI+ status or identity.

*Id.* (codified at 45 C.F.R. § 1355.22(d)(2)(i)–(vi)).

57.     On top of these substantive requirements, the Final Rule contains several procedural requirements. For example, every Title IV-E and Title IV-B agency must also implement a process by which an LGBTQI+ child may request such a "designated" placement or request that their current placement be offered services to qualify or meet the requirements of a "designated" placement. 89 Fed. Reg. at 34,859 (codified at 45 C.F.R. § 1355.22(b)(2)).

58.     This notice requirement at minimum must be provided to (1) all children aged 14 and older and (2) certain children aged 14 and under who have been removed from their home due to familial conflict about their LGBTQI+ status, have disclosed their LGBTQI+ status, or are otherwise known by the agency to identify as LGBTQI+. 89 Fed. Reg. at 34,859–60 (codified at 45 C.F.R. § 1355.22(b)(2)(i)).

59.     This notice must further be provided both verbally, in writing, and in an age- or developmentally appropriate manner, and it must inform the child of (1) the process for how they may request a designated placement or services for their current placement; (2) the process the agency will use to respond to their request; and (3) the non-retaliation protections included in the Final Rule, along with the accompanying process by which a child may report a concern about retaliation. 89 Fed. Reg. at 34,860 (codified at 45 C.F.R. § 1355.22(b)(2)(ii)–(iii)).

60.     Separately, an agency must also "implement a process for LGBTQI+ children to report concerns about a placement that fails to meet the applicable requirements of this [Final Rule], and to report concerns about retaliation." *Id.* (codified at 45 C.F.R. § 1355.22(c)). This process must safeguard the privacy and confidentiality of the child, and the agency must respond promptly to an LGBTQI+ child's reported concern in a way that is consistent with the agency's timeframes for investigating child abuse and neglect reports, which in turn is dependent on the nature of the child's report. *Id.*

61.     All Title IV-E and Title IV-B agencies must further implement certain training requirements and additional notification requirements. Agencies must particularly ensure that employees with responsibility for placing children in foster care, making placement decisions, or providing services (1) "[a]re trained to implement the procedural requirements" of this Final Rule

and (2) "[a]re adequately prepared with the appropriate knowledge and skills to serve an LGBTQI+ child related to their sexual orientation, gender identity, and gender expression." *Id.* (codified at 45 C.F.R. § 1355.22(h)(1)(i)–(ii)). Agencies must similarly ensure that contractors and subrecipients with responsibility for placing children in foster care, making placement decisions, or providing services are informed of the procedural requirements, including any non-retaliation provisions, and it must ensure that that placement providers are informed of such procedural requirements as well. *Id.* (codified at 45 C.F.R. § 1355.22(h)(2)–(3)).

## IV.  The Impact of the Final Rule on Texas

62.     As a result of the broad, systemic impact of the Final Rule on Texas, DFPS will begin its preparation for implementation of the Final Rule next month, two years before the October 1, 2026 implementation date.

63.     The Final Rule has an enormous impact on Texas and its foster-care system. Specifically, the Final Rule irreparably harms Texas because it (1) imposes substantial compliance costs; (2) threatens substantial economic injury to Texas; and (3) infringes on Texas's sovereignty by imposing the Biden Administration's LGBTQI+ agenda despite conflicting state policies.

64.     *First*, the Final Rule imposes compliance costs. These compliance costs stem from the various new protections and processes created under the Final Rule. Specifically, Texas and DFPS must now recruit additional foster-care providers that are willing to meet the Final Rule's requirements or allow youth to remain in their current placements if the placement agrees to meet the conditions of a designated placement—all while dealing with a shortage of current foster-care providers. Texas and its agencies must now offer the child a placement consistent with their gender identity, and it must also consult with the child to provide an opportunity to voice any concerns related to placement. 89 Fed. Reg. at 34,860 (codified at 45 C.F.R. § 1355.22(f)). Texas must create new procedures and policies that affirm LGBTQI+ status or identity in children. And Texas agencies must create and implement entirely new notification requirements and trainings for agencies, foster-care providers, and children. In anticipation of these burdensome requirements,

DFPS is currently expending staff time and resources to determine all it must do to render its programs compliant with the Final Rule.

65.     Importantly, all of this costs Texas money. Even ACF itself "acknowledges that there will be a cost to implement changes made by this rule as we anticipate that a majority of states and tribes would need to expand their efforts to recruit and identify providers and foster families that the state or tribe could identify as Designated Placements for LGBTQI+ children." 89 Fed. Reg. 34,854. These compliance costs irreparably harm Texas because "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (emphasis in original); *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022).

66.     *Second*, the Final Rule would cause additional economic injury. As discussed above, Texas and DFPS receive approximately $63,389,793 in Title IV-B funding and $368,772,531 in Title IV-E funding, totaling $432,162,324 per year in Title IV-E and Title IV-B funding. Texas and DFPS utilize the Title IV-E funding to support casework services for children in foster care, residential childcare services, and placement services.

67.     But when Texas contradicts the Final Rule by choosing the best interests of the child and working with foster-care providers that do not affirm LGBTQI+ status or identity in children, it stands to lose federal funding either due to HHS penalizing Texas under 42 U.S.C. § 674(d)(1) or withholding approval—and concomitant funding—of the State's foster care plan. *Id.* at § 674(a) (stating state agencies are entitled to foster care funding if they have "approved" plans). Hence, these economic injuries impose irreparable harm on Texas because, while financial injuries are generally reparable, sovereign immunity would bar recovery against the United States. *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

68.     *Third*, and finally, the Final Rule inflicts a sovereign injury on Texas. Generally, "[s]tates possess special proficiency in the field of domestic relations, including child custody." *Reno v. Flores*, 507 U.S. 292, 310 (1993) (cleaned up). "The whole subject of the domestic relations

of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *Ex parte Burrus*, 136 U.S. 586, 593–94 (1890).

69.     Because the Final Rule requires Texas and its foster-care system to support and affirm LGBTQI+ children, make placements "consistent with" a child's subjective gender identity, and prohibits Texas and its agencies from even attempting to disagree with a child's vaunted LGBTQI+ status or identity, it conflicts with policies that require foster care placing agencies to separate children by sex, including the Texas Administrative Code requirement that opposite-sex children be housed separately. 26 Tex. Admin. Code § 749.3029; *see Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (noting that "states have a sovereign interest in the power to create and enforce a legal code.").

70.     Additionally, Texas law prohibits the provision to minors of certain medical procedures that are intended to "reassign" or "transition" a person's sex at birth. *See* Tex. Health & Safety Code Ann. § 161.702. Provision of these procedures can constitute child abuse, and DFPS has the authority and mandate to investigate and correct abuse when it takes the form of these procedures. This can include ending or modifying a foster care relationship in response to a caregiver providing sex-reassignment therapies.

71.     However, the Final Rule's retaliation provision would curtail DFPS's ability to continue enforcing this aspect of state law, because it prohibits using information related to a child's gender identity to open an investigation concerning that child's foster provider, making placement changes in response to "gender affirming" treatment, and taking action against foster providers in response to their "support" for a child's "LGBTQI+ status or identity." 89 Fed. Reg. 34860.

72.     That hurts Texas's sovereign interest in enforcing its law and protecting Texan children. That hurts foster-care providers who want to be a loving home for children. And that hurts children who are already facing difficult circumstances.

73.     By preventing Texas from enforcing its own duly enacted laws and policies, the Final Rule causes irreparable harm to Texas. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)

("[T]he inability to enforce its duly enacted plan clearly inflicts irreparable harms on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time [a State is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("[T]he State necessarily suffers the irreparable harm of denying the public interes0t in the enforcement of its law").[3]

CLAIMS FOR RELIEF

COUNT I<br>
The Final Rule Exceeds Statutory Authority<br>
and is Not in Accordance with Law<br>
5 U.S.C. § 706

74.     Plaintiff incorporates by reference all other paragraphs.

75.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This is because "[a]dministrative agencies are creatures of statute" and "accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

76.     The Final rule is not in accordance with law because it contradicts and undermines the statutes governing Title IV-E and Title IV-B funding.

77.     By passing statutory anti-discrimination requirements applicable to Title IV-E/IV-B funding, Congress carefully considered and adopted the protections it deemed necessary and appropriate in this context. That carefully circumscribed context was limited to discrimination on

---

[3] And when States "assert [their] rights under federal law" to protect their quasi-sovereign interests "in the health and well-being—both physical and economic—of [their] residents in general," they have *parens patriae* standing. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982); *see also Texas v. Becerra*, 577 F. Supp. 3d 527, 559 (N.D. Tex. 2021) (granting a preliminary injunction and finding that Texas had *parens patriae* standing to assert the State's interests "in the health and well-being . . . of its residents in general" to prevent the adverse impact of federal COVID-19 vaccine mandates on Head Start offerings).

15

the basis of "race, color, or national origin." 42 U.S.C. § 671(a). Congress chose not to prohibit discrimination on the basis of sex, sexual orientation, or gender identity. Nor did Congress leave this issue open to regulatory amendment or create a gap for HHS to fill. HHS does not have discretion to impose additional anti-discrimination requirements, like the Designated Placement requirements—and no statute authorizes the HHS to impose such additional anti-discrimination requirements.

78.     Moreover, exposing Texas to the costs of compliance and risks of withholding of Title IV-E and Title IV-B funds based on the Final Rule would be inconsistent with the statutes requiring HHS to make Title IV-E payments to States with approved plans. Indeed, the Final Rule contradicts and undermines Title IV-B and Title IV-E by deviating from the anti-discrimination requirements found in the statute and by changing the way anti-discrimination requirements are enforced, regardless of whether they are found in the statute.

79.     Congress gave the Secretary a mandatory duty to approve plans that comply with the statutory criteria, including the statutory anti-discrimination requirements.

80.     Congress gave the Secretary a mandatory duty to make payments to States with approved plans.

81.     HHS may not fashion a new anti-discrimination mandate out of whole cloth. Certainly, the statute's generic language stating that foster care plans must provide for the "safe and proper" care of foster charges does not authorize HHS to regulate the way state foster care systems handle gender identity or sexual orientation.

82.     For HHS to withhold Title IV-E funding for reasons not grounded in statute— including for failure to comply with the Designated Placement rule—would violate Title IV-E. In that situation, the Secretary would have violated his mandatory duties, and Defendants would have violated the law.

### COUNT II
### The Final Rule is Arbitrary and Capricious
### 5 U.S.C. § 706

83.     Plaintiff incorporates by reference all other paragraphs.

84.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A). This means if an agency action is not "reasonable and reasonably explained," it must be vacated. *Wages & White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("[A] lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law."); *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (citation omitted).

85.     "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

86.     "Under the arbitrary-and-capricious standard, [an agency] must show that it has reasonably considered the relevant issues and reasonably explained the decision. That requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within." *U.S. Chamber of Commerce v. U.S. Sec. & Exch. Comm'n*, 85 F.4th 760, 774 (5th Cir. 2023) (citation omitted).

87.     Here, the Final Rule is arbitrary and capricious for several reasons. *First*, HHS did not consider the risk that current providers would be subject to additional costs in retaliation claims, nor the likelihood that providers would leave the foster care system entirely, resulting in fewer available placements for foster children. Remarkably, HHS did not consider whether the Final Rule would support or harm children in foster care. It did not analyze whether the Placement

Requirement Rule would decrease the quantity or quality of child placement agencies by driving away non-compliant organizations. *See* 89 Fed. Reg. 34,851. This consideration takes on heightened salience given the lingering shortage of qualified providers that Texas and many of its sister states are currently facing. The potential for the Rule to exacerbate this ongoing shortage of providers and the harm it causes to Texas and its foster-care children is an "important aspect of the problem" that HHS failed to consider. *State Farm*, 463 U.S. at 43.

88.     *Second*, the Final Rule requires agencies to place LGBTQI+ youth in a placement consistent with their gender identity, but this includes sex-segregated childcare facilities. This likely means that children may have their privacy concerns violated by having to undress in front of another child of the opposite sex.

89.     *Third*, the Final Rule does not waive its requirements for kinship caregivers or for parents who resume care for foster children and whose parental rights are intact. Title IV-E expresses Congress's preference that foster children be placed with relatives whenever possible. However, the Rule creates new burdens for family members who offer care for their foster relations that may impede the willingness or ability of relatives to participate in foster care. In particular, the Rule's broad retaliation prohibition forces LGBTQI+ affirmation down the throats of parents and relative caregivers.

90.     *Fourth,* the HHS through this regulation has interpreted its statutory authority as allowing them room to disregard the best interests of the child and instead treat a provider's stance on sexual orientation and gender identity issues as the dispositive consideration in whether a placement is appropriate. Nothing in the statute suggests that Congress meant to grant HHS this federal veto power over foster children's placements.

**COUNT III**
**The Final Rule is Contrary to the U.S. Constitution:**
**(Spending Clause)**
**5 U.S.C. § 706(2)(A)**

91.     Plaintiff incorporates by reference all other paragraphs.

92.     The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see also id.* § 706(2)(A).

93.     Congress passed Title IV-E and Title IV-B under the Spending Clause of the United States Constitution.

94.     The Spending Clause grants Congress the power to "pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1.

95.     When Congress exercises its Spending Clause power against the States, principles of federalism require that conditions on Congressional funds given to states must enable a state official to "clearly understand," from the language of the law itself, what conditions the State is agreeing to when accepting the federal funds. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Specifically, the Supreme Court has recognized several restrictions on this use of the Spending Clause power, including that: (1) conditions must be "unambiguous[]" so States can "exercise their choice knowingly, cognizant of the consequences of their participation," (2) conditions must be related to the "federal interest in the project," (3) spending must not "induce the [S]tates to engage in activities that would themselves be unconstitutional," and (4) spending must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'" *South Dakota v. Dole*, 483 U.S. 203, 207–11 (1987) (quoting *Charles C. Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)).

96.     "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the [State] voluntarily and knowingly accepts the terms of the 'contract.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

97.     Here, the Final Rule violates the Spending Clause because the Final Rule's extensive mandates about LGBTQI+ children are absent from the statute. These is no clear statutory basis for a new condition requiring separate placement conditions for LGBTQI+ children. Accordingly, States like Texas were not on fair notice that their receipt of federal funds for foster care could be burdened by a regulatory mandate to affirm LGBTQI+ wards.

98.     Further, Congress would have spoken clearly had it meant to vest HHS with the power to link States' funding with their accepting federal micromanagement of foster providers on LGBTQI+ issues. Congress's silence implies that the Rule's protections for LGBTQI+ youth are foreign to the purposes Congress intended Title IV-E and IV-B to serve. And even if there was any ambiguity about whether the Social Security Act authorizes HHS to add gender-identity discrimination requirements to state plans, the Major Questions Doctrine mandates that the authority does not exist because such authority must be clearly stated. Accordingly, the Rule adds new conditions on federal funding that do not advance the "federal interest in the project," but instead shoehorns gender ideology into a statutory scheme that allows no room for it.

99.     Likewise, the Final Rule's coercive influence over Texas does not survive Spending Clause scrutiny.

### DECLARATORY JUDGMENT

100.    The federal Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n.11 (1974).

101.    For the reasons described above, Texas is entitled to a declaration that Defendants are violating the law and that the Final Rule is unlawful, unconstitutional, and unenforceable.

### DEMAND FOR RELIEF

Plaintiff asks that the Court:

a.  Hold unlawful and set aside (*i.e.*, vacate) the Final Rule under 5 U.S.C. § 706;

b.  Declare that the Final Rule is unlawful;

c.  Postpone the effective date of (*i.e.*, stay) the Final Rule under 5 U.S.C. § 705 or preliminarily enjoin Defendants' implementation of the Final Rule;

d.  Issue a permanent injunction prohibiting Defendants from interpreting or enforcing Title IV-E or Title IV-B of the Social Security Act, or any implementing regulations thereto, as requiring additional foster-care placements, services, protections, notification requirements, or trainings based on sexual orientation, gender identity, gender expression, or the LGBTQI+ status or identity of children—and from enforcing, implementing, or relying on the Final Rule against Texas (including any of its instrumentalities, agencies, and political subdivisions) for refusing to comply with the Final Rule; and

e.  Award such other and further relief as the Court deems equitable and just.

Date: September 24, 2024

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Telephone:  (512) 463-2100
Facsimile:   (512) 457-4410

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas State Bar No. 24105085
ryan.walters@oag.texas.gov

**JACOB E. PRZADA**
Special Counsel
Texas State Bar No. 24125371
jacob.przada@oag.texas.gov

**KYLE S. TEBO**
Special Counsel
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

**COUNSEL FOR PLAINTIFF
STATE OF TEXAS**