# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS, <br><br> *Plaintiff*, <br><br> v. <br><br> XAVIER BECERRA, Secretary of the United States Department of Health and Human Services, in his official capacity; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JEFF HILD, Principal Deputy Assistant Secretary for the Administration for Children and Families; ADMINISTRATION FOR CHILDREN AND FAMILIES; REBECCA JONES GASTON, Commissioner of the Administration on Children, Youth and Families, and Acting Associate Commissioner of the Children's Bureau, in her official capacity; ADMINISTRATION ON CHILDREN, YOUTH AND FAMILIES; CHILDREN'S BUREAU; and the UNITED STATES OF AMERICA, <br><br> *Defendants*. | CIVIL ACTION NO. 6:24-CV-348-JDK |

## OPPOSED MOTION FOR STAY OF AGENCY ACTION

**INTRODUCTION**

The Biden-Harris Administration has taken the unprecedented step of weaponizing federal foster-care policy to advance its political agenda, forcing States like Texas to adopt unlawful, burdensome, and ideologically charged mandates under the guise of protecting "LGBTQI+"[1] youth. Through a sweeping new rule from the Department of Health and Human Services (HHS), the federal government demands that Texas radically reshape its foster care system, imposing requirements that not only upend longstanding state authority but also jeopardize the welfare of vulnerable children in foster care. *See Designated Placement Requirements Under Titles IV–E and IV–B for LGBTQI+ Children*, 89 Fed. Reg. 34818 (Apr. 30, 2024) (Final Rule).

The Final Rule decrees that foster placements must affirm a child's declared sexual orientation or gender identity—in direct contravention of biological realities—and obligates States to establish "designated placements" with foster caregivers who will encourage such identities. 89 Fed. Reg. 34818–19. This sweeping mandate even extends to mixed-sex housing arrangements in foster facilities. *Id.* 34837; 34860.

The Final Rule also requires state agencies to prevent and remedy "retaliation … based on [a] child's actual or perceived LGBTQI+ status or identity," where retaliation is defined to encompass a broad swath of conduct that purportedly undermines LGBTQI+ identity. *Id.* 34860. Title IV agencies must provide children resources that "are supportive of their sexual orientation and gender identity." *Id.* And placements into foster care must be made "consistent with" a child's self-identified gender, entailing mixed-sex housing in many foster facilities. *Id.*

As a result of the Final Rule's stringent new requirements, Texas and its foster care providers have already started working to implement new protocols and procedures to comply with the Final Rule. Ex. A ¶ 5. Faced with serving over 17,000 children in its foster care system, Texas

---

[1] Texas uses the language of the Final Rule, which uses "LGBTQI+" and similar euphemisms to refer to individuals that identify themselves based on the contested metaphysical concepts of sexual orientation or gender identity.

2

must now choose between surrendering the discretion that Congress entrusted to it under Title IV-E to act in the best interest of children and risking the loss of critical federal funding. This ideologically driven federal overreach violates the Administrative Procedure Act (APA) and this Court should issue a stay to postpone the effective date of the illegal Final Rule.

**BACKGROUND**

## I.    Title IV-E provides funding to States for foster care.

Federal law governs foster care funding through Title IV-E of the Social Security Act, also known as the Child Welfare Act (CWA). 42 U.S.C. §§ 670–679c.[2] Title IV-E provides States with grants for foster care, adoption assistance, and related services. The Department of Health and Human Services (HHS) administers these funds, and the Department of Family and Protective Services (DFPS) manages them in Texas, receiving roughly $368 million annually. Ex. A ¶ 4. States seeking Title IV-E funds must submit a plan for federal approval.

The law prohibits discrimination in foster care placements based on race, color, or national origin. But it is silent on sex, sexual orientation, and gender identity. If a State violates the law's anti-discrimination rules, HHS can cut funding. Non-state entities can also face penalties or lawsuits from individuals harmed by discrimination. Importantly, once a State complies with Title IV-E's requirements, HHS must approve the State's plan and release funds. The statute does not give the agency room to impose extra conditions.

## II.    HHS imposes onerous requirements on States through the Final Rule.

In April 2024, HHS issued a Final Rule requiring states to implement sweeping changes by October 2026. The Final Rule focuses on LGBTQI+ children in foster care and imposes new substantive and procedural requirements.

The Final Rule mandates "Designated Placements" for LGBTQI+ children. Such

---

[2] In 1980, Congress amended the Social Security Act to enact the Adoption Assistance and Child Welfare Act of 1980, which required state foster care systems to meet certain minimum conditions to qualify for federal funds. 42 U.S.C. §§ 621, 670.

placements must provide supportive environments, properly trained staff, and access to "affirming "resources. *See* 89 Fed. Reg. 34859. The Final Rule also requires that agencies weigh a child's preferences heavily in making placement decisions, including offering placements that align with the child's gender identity. *Id*. 34860.

The Final Rule prohibits "retaliation" against LGBTQI+ children. Retaliation includes harassment, unwarranted placement changes, or actions that harm a child based on their sexual orientation or gender identity. *Id*. Agencies must establish processes for children to report retaliation or inadequate placements and respond swiftly to such reports. *Id*.

The Final Rule also adds procedural burdens. Agencies must notify children of their rights under the Final Rule, train staff to meet its requirements, and implement policies that affirm LGBTQI+ identities. *Id*. 34859–60. Agencies must develop new systems to monitor and report compliance, increasing administrative demands on state resources. *Id*. 34860.

## STANDARD OF REVIEW

The APA empowers reviewing courts to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" in lieu of a preliminary injunction. 5 U.S.C. § 705. "In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under section 705] is the temporary form of vacatur." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023). This empowers courts to stay an agency action even after its effective date. *See Texas v. Biden*, 646 F. Supp. 3d 753, 770–71 (N.D. Tex. 2022) (Kacsmaryk, J.), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (May 25, 2023). "Courts grant relief under § 705 based on the traditional four equitable factors for injunctive relief: (1) plaintiff's likelihood of success on the merits; (2) the threat of irreparable harm without a stay; (3) whether other interested parties will be irreparably injured by a stay; and (4) the public interest." *Fed'n of Americans for Consumer Choice, Inc. v. United States Dep't of Lab.*, No. 6:24-CV-163-JDK, 2024 WL 3554879, at *9 (E.D. Tex. July 25, 2024) (Kernodle, J.) (cleaned up).

## ARGUMENT

**I.      Texas is likely to succeed on the merits.**

The likelihood of success on the merits is "arguably the most important" factor in determining whether preliminary relief is warranted. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005). Courts routinely consider it dispositive, as it anchors all other considerations. *See Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023). Texas is likely to prevail here because the Final Rule exceeds the statutory authority granted to HHS under Title IV-E, violates the APA, and flouts core principles of federalism. The Final Rule is "not in accordance with law," "in excess of statutory … authority," "contrary to constitutional right, power, privilege, or immunity," and "arbitrary and capricious." 5 U.S.C. § 706(2)(A–C).

**A.  Texas has standing to challenge the Final Rule.**

When the plaintiff is "an object of the [agency's] action," "there is ordinarily little question that the action … has caused him injury, and that a judgment preventing … the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). Here, there is no doubt that Texas is "an object of [the agency's] action," so all three of the constitutional standing requirements are satisfied. *Id.*; *see also Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1136 (D.N.D. 2021) ("Plaintiffs, as entities that operate health programs receiving federal financial assistance from HHS, qualify as objects of Section 1557 [of the Affordable Care Act, which incorporates Title IX] and its implementing regulations" and therefore have standing to challenge an interpretation of that statute), *aff'd sub nom*, 55 F.4th 583 (8th Cir. 2022).

Though the Final Rule's compliance deadline is October 2026, Texas faces immediate costs to prepare. Ex. A ¶ 7. The Final Rule imposes significant new obligations on DFPS, including expanded training, monitoring, and provider recruitment—none of which can be accomplished without additional state funding. The Texas Legislature, which convenes only every two years, will next meet in January 2025 to adopt a budget covering September 2025 through August 2027. Ex. A ¶ 6. To secure the necessary funding, DFPS must submit its proposed budget during that session. *Id.* This requires DFPS to begin planning now or risk being unable to finance the compliance

5

measures the Final Rule demands. *Id*. The Final Rule will harm Texas in several ways.

*First*, compliance is expensive. Texas must recruit new foster care providers willing to meet the Final Rule's demands, address placement gaps, and retrain staff. It must implement policies and procedures affirming LGBTQI+ identities while managing an existing shortage of foster care providers. These efforts injure Texas by requiring substantial time and resources, all at taxpayer expense. Ex. A ¶ 8, 10; *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *16 (N.D. Tex. Feb. 27, 2024) (Hendrix, J.) (the "initial administrative costs" that States must front to implement the "legal-research costs, updating policies, and amending trainings" inherent in a major rule change constitute a cognizable, "pocketbook" injury when they are borne by the States' fiscs). Indeed, Defendants acknowledge "that there will be a cost to implement changes made by this rule" and anticipates that a "majority of [S]tates and tribes would need to expand their efforts to recruit and identify providers and foster families that the [S]tate or tribe could identify as Designated Placements for LGBTQI+ children." 89 Fed. Reg. 34854. "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). A plaintiff "need not convert each allegation of harm into a specific dollar amount," *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 236 (5th Cir. 2024) (cleaned up)—"alleged compliance costs need only be more than de minimis." *Id*. (cleaned up); *see also id*. (crediting evidence that plaintiffs would have to "expend more time and resources to train their staff due to the Rule").

*Second*, the Final Rule threatens Texas's federal funding. DFPS receives over $432 million annually from Title IV-E and Title IV-B programs. Ex. A ¶ 4. Non-compliance could result in funding cuts, jeopardizing vital services. Even complying with the Final Rule risks conflict with state laws, such as those prohibiting certain medical interventions for minors related to gender identity. For example, when Texas contradicts the Final Rule by choosing the best interests of the child and working with foster-care providers that do not affirm LGBTQI+ status or identity in

children, it stands to lose federal funding either due to HHS penalizing Texas under 42 U.S.C. § 674(d)(1) or withholding approval—and concomitant funding—of the State's foster care plan. *Id.* § 674(a) (stating state agencies are entitled to foster care funding if they have "approved" plans). To this end, DFPS faces a Hobson's choice between violating state laws or losing federal funding. An impossible choice such as this "between violating federal rules … on the one hand, and transgressing longstanding policies and practices" constitutes cognizable harm. *Texas v. United States*, 201 F. Supp. 3d 810, 834 (N.D. Tex. 2016) (O'Connor, J.) (finding that a similar conflict gave rise to standing *and* irreparable injury) (citing *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir.1975)); *see also Texas v. EEOC*, 933 F.3d 433, 446–47 (5th Cir. 2019) ("[B]eing pressured to change state law constitutes an injury").

*Third*, the Final Rule intrudes on Texas's sovereignty. Child welfare falls squarely within state authority. But the Final Rule forces Texas to adopt policies that clash with its laws, including rules requiring the separation of opposite-sex children and limits on gender-transition procedures for minors. By doing so, the Final Rule undermines Texas's ability to govern foster care according to its values and laws. The Final Rule compels Texas and its foster-care system to support and affirm LGBTQI+ children, make placements aligned with a child's subjective gender identity, and prohibits any disagreement with a child's asserted LGBTQI+ status. This mandate conflicts with policies requiring foster-care agencies to separate children by sex, including the Texas Administrative Code's rule that opposite-sex children be housed separately. 26 Tex. Admin. Code § 749.3029; *see Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (noting that "[S]tates have a sovereign interest in the power to create and enforce a legal code."); Ex. A ¶ 12. And Texas law prohibits the provision to minors of certain medical procedures that are intended to "reassign" or "transition" a person's sex. *See* Tex. Health & Safety Code Ann. § 161.702. Provision of these procedures can constitute child abuse, and DFPS has the authority and mandate to investigate and correct abuse when it takes the form of these procedures. Ex. A ¶¶ 16–17. This can include ending or modifying a foster care relationship in response to a caregiver providing sex-reassignment therapies. Tex. Fam. Code §§ 261.501-505, 262.001–.417.

7

Yet the Final Rule's retaliation provision would curtail DFPS's ability to continue enforcing this aspect of state law, because it prohibits using information related to a child's gender identity to investigate that child's foster provider, making placement changes in response to "gender-affirming" treatment, and taking action against foster providers in response for their "support" for a child's "LGBTQI+ status or identity." 89 Fed. Reg. 34860; *see also* Ex. A ¶¶ 16–19. This hurts Texas's sovereign interest in enforcing its law and protecting Texan children. And it hurts foster-care providers who want to be a loving home for children. Above all, it hurts children who are already facing difficult circumstances. *See* Ex. A ¶¶ 11–15.

In sum, the Final Rule burdens Texas with heavy costs, risks critical funding, and disrupts state governance. It harms foster families, children, and the system designed to protect them.

## B. The Final Rule exceeds HHS' legal authority.

Like any administrative agency, HHS is a "creature[] of statute." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). Accordingly, it "must point to explicit [c]ongressional authority justifying [its] decisions." *Inhance Techs., L.L.C. v. U.S. EPA*, 96 F.4th 888, 893 (5th Cir. 2024) (quoting *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019)). To determine whether a statute granted an agency the authority it claims, courts look to the statute's text. *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *cert. granted,* 144 S. Ct. 1390 (2024) ("How do we know when an agency has exceeded its statutory authority? Simple: the plain language of the statute tells us so."); *see also BedRoc Ltd., L.L.C. v. U.S.*, 541 U.S. 176, 183 (2004) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous").

### 1. Congress has foreclosed protections for sexual orientation or gender identity.

The only express anti-discrimination provisions in Title IV-B and IV-E are limited to prohibiting the "delay or den[ial]" of foster care placements "on the basis of the race, color, or national origin of the adoptive or foster parent, or the child." 42 U.S.C. § 671(a)(18). Conspicuously absent is the inclusion of sex as a protected class, much less the array of classifications under the "LGBTQI+" umbrella. Since race, color, and national origin belong to "a

8

commonly associated group or series" in which sex, sexual orientation and gender identity are sometimes included, by expressing some of these classifications, the statute "excludes [others] left unmentioned." *United States v. Vonn,* 535 U.S. 55, 65 (2002); *see also* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 ("Negative–Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)"). That HHS is attempting to insert a new protected class into the anti-discrimination requirements is evidenced by the Final Rule's citations to Title VII hostile-environment caselaw for sex discrimination (the very category of discrimination Congress refused to create for foster care). *See* 89 Fed. Reg. 34827, 34828 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)).

Equally absent is any requirement for state agencies to provide special accommodations to foster charges that belong to those protected classes. In that regard, Title IV is unlike other statutory schemes, such as the Americans with Disabilities Act, that protect against discrimination and maltreatment by requiring accommodating facilities and resources be made available. Instead, Title IV-E's anti-discrimination measures are negative, and § 671(a)(18) stops at prohibiting adverse action against the groups it designates. This restraint is meaningful because in other parts of the statute Congress showed it was fully capable of requiring accommodations when it wanted to. Other enumerated criteria require state plans to provide for specific placement strategies for children facing specific circumstances, including for children who are siblings. *Id.* § 671(a)(31). That Congress saw fit to specially provide for proactive treatment of some children but refrained from doing so for LGBTQI+ children strongly implies that it did not empower HHS to do so. *Cf. United States v. Vargas*, 74 F.4th 673, 686 (5th Cir. 2023) ("[T]he statutory text communicates exclusivity."). Likewise, the absence of sex and sexual identity classifications from § 671(a)(18) is not an omission but an exclusion.

Nor did Congress provide HHS discretion to add criteria for state plans. Rather, the statute imposes a mandatory duty on the Secretary of HHS to approve those that meet the requirements set out in § 671(a). *See* 42 U.S.C. § 671(b) ("The Secretary *shall* approve any plan which complies with the provisions of subsection (a) of this section") (emphasis added). And the thoroughness of

§ 671(a)'s list strongly implies that Congress intended it to be a complete catalog of all that States must provide when submitting their plans for approval. These features comprise an exhaustive list of thirty-seven requirements that States must meet to obtain approval. Simply put, these thirty-seven enumerated criteria comprise a closed list which HHS may not enlarge through rulemaking.

Thus, by creating requirements for sexual orientation and gender identity out of whole cloth, "[t]he Final Rule adds several key words not in the statute [and] … thus impermissibly 'rewrite[s]' statutory language by ascribing additional, material terms.'" *Tex. Med. Ass'n v. HHS*, 587 F. Supp. 3d 528, 542 (E.D. Tex. 2022) (Kernodle, J.) (quoting *Texaco Inc. v. Duhe*, 274 F.3d 911, 920 (5th Cir. 2001)). No matter Defendants' perceived "problem," nor how allegedly "help[ful]" their regulatory solution, it is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *see also* READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 ("Nothing is to be added to what the text states or reasonably implies … . That is, a matter not covered is to be treated as not covered.").

### 2. Defendants have no valid authority for the Final Rule.

Perhaps acknowledging that Section 671 provides an exhaustive list, the Final Rule unsuccessfully attempts to derive authority for its new requirements under three of § 671(a)'s enumerated criteria. 89 Fed. Reg. 34820–21. The Final Rule relies on the statute's requirement that States maintain "a case plan … for each child receiving foster care maintenance payments under the State plan." 42 U.S.C. § 671(a)(16). The content of each case plan must include "[a] plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child." *Id.* § 675(a)(1)(B). The plan must also include "a discussion of the appropriateness of the services" that it contemplates. Another one of § 671(a)'s enumerated requirements obligates States to "certif[y] that … prospective foster parents will be prepared adequately with the appropriate knowledge and skills to provide for the needs of the child." *Id.*

§ 671(a)(24). Finally, state plans must also "provide[] that … the State shall develop and implement standards to ensure that children in foster care placements … are provided quality services that protect the safety and health of the children." *Id.* § 671(a)(22). But none of § 671(a)(16), (22), or (24) address sexual orientation or gender identity. Undeterred, HHS fastens on generic language from these subparagraphs to justify its authority. According to the Secretary, the statute's directive that state case plans and case review work towards "placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available" furnishes adequate support for requiring States to recruit LGBTQI+-affirming providers and, upon request, place foster children with them. 89 Fed. Reg. 34820 (citing 42 U.S.C. § 675(5)(A)). This interpretation falls on its face, not least because neither the cited language nor any other portion of the statute actually directs States to augment their foster-care provider network—rather, it creates a duty to work with the best placement resources on hand. *See* 42 U.S.C. § 675(5)(A) (requiring placement in "most appropriate setting *available*") (emphasis added).

The other statutory support HHS relies on fares no better. Under § 671(a)(22), States must endeavor to provide "quality services" that protect child "safety and health," and under § 671(a)(24), States are to plan for educating foster parents with "appropriate knowledge and skills." From these reed-thin supports hang a broad-based mandate to prevent, monitor, and punish "retaliation;" a duty to make LGBTQI+-affirming resources available; and myriad training and notification requirements. Yet none of this authority stems from the statute.

The Court should be "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Texas v. Becerra*, No. 6:24-CV-211-JDK, 2024 WL 3297147, at *8 (E.D. Tex. July 3, 2024) (Kernodle, J.) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)), *modified on reconsideration,* No. 6:24-CV-211-JDK, 2024 WL 4490621 (E.D. Tex. Aug. 30, 2024). When Congress wants to "authoriz[e] an agency to exercise powers" on matters of "vast" "economic and political significance," it must "speak clearly." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam). When it does not, "important subjects" remain "entirely regulated

by the legislature itself." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). Courts cannot rely on "ambigu[ous] or doubtful expression[s]" of Congress's intent to "resolve important policy questions." *NFIB*, 595 U.S. at 125 (Gorsuch, J., concurring). This "background interpretive principle"—"rooted in the Constitution's separation of powers"—has at least as much force as the contract-law analogy that applies to spending-power laws. *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 230 (2022) (Kavanaugh, J., concurring). And the principle has particular force on important matters involving "earnest and profound debate." *Gonzales v. Oregon*, 546 U.S. 243, 249 (2006). Extending anti-discrimination provisions to include sexual orientation and gender identity surely falls within that category. *See Gibson v. Collier*, 920 F.3d 212, 224 (5th Cir. 2019) ("sex reassignment surgery is fiercely debated within the medical community"); *Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 3658767, at *36 (N.D. Tex. Aug. 5, 2024) (O'Connor. J.) (noting "the enormous social and political significance associated with transgenderism and gender-identity issues" made it a "major question that properly belongs to Congress").

Simply put, HHS's interpretation violates the strictures of several canons of statutory interpretation. As discussed above, HHS does not have the authority to enact the Final Rule because 42 U.S.C. § 671(a)(18) necessarily excludes both sexual orientation and gender identity as protected characteristics. 42 U.S.C. § 671(a)(18). The negative implication canon therefore dictates that the legislature intentionally omitted sex, gender identity, and sexual orientation from the statute. READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107. More than that, Congress's specific anti-discrimination provisions in this context, 42 U.S.C.A. § 671(a)(18), cannot be trumped by the general language HHS cites here. *See* READING LAW 187 (in conflict between a general provision and a specific one, the specific provision prevails).

   **3. Title IV-E entrusts States, not the federal government, to run foster care systems.**

Congress entrusted States—not HHS—with the details of operating foster care. "States possess special proficiency in the field of domestic relations, including child custody," *Reno v. Flores*, 507 U.S. 292, 310 (1993) (cleaned up), and have a "compelling interest in protecting the physical and psychological well-being of minors," *Reno v. ACLU*, 521 U.S. 844, 869 (1997)

(citation omitted); indeed, "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the [S]tates, and not to the laws of the United States." *In re Burrus*, 136 U.S. 586, 593–94 (1890). Title IV-E's purpose is to "enable[] each State to provide" foster care, 42 U.S.C. § 670, empowering States rather than restricting them. States retain control over placement and care decisions, and the statute emphasizes state agency discretion. 42 U.S.C. §§ 671(a)(2), 672(a)(2)(B), 678. By contrast, HHS's role is narrow and ministerial: approving compliant state plans, dispensing funds, and offering technical assistance. 42 U.S.C. §§ 671(b), 674, 676(a), 679(b)(2). The statute grants no broad rulemaking authority to HHS. By imposing detailed federal requirements on how foster families treat certain children, HHS intrudes on an area traditionally reserved for state law. *See Alabama Ass'n of Realtors*, 594 U.S. at 764. For example, in citing hostile environment law, 89 Fed. Reg. 34827, HHS improperly elevates anti-discrimination principles Congress never created for foster care over the "best interest of the child" as determined by the States—which is the "primary consideration" of Texas and other States when determining custody of children. Tex. Fam. Code Ann. § 153.002. To that end, the Final Rule treats a provider's stance on LGBTQI+ issues as the dispositive factor in determining placement suitability, displacing the nuanced, case-by-case analysis States traditionally employ in this space. *See, e.g., Bryan C. v. Lambrew*, 340 F.R.D. 501, 529–30 (D. Me. 2021). Nothing in Title IV-E grants HHS this sweeping authority. If Congress wanted to give HHS veto power over foster placements made in the best interest of children, it must speak "exceedingly clear[ly]" to alter the federal-state balance in family law. *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020). But the generic language on which HHS relies does not empower it to deprive the States of their primacy in family-law matters. On the contrary, Title IV-E directs States to administer foster care while confining HHS to an ancillary role.

### C. The Final Rule violates the Spending Clause.

Congress adopted Title IV pursuant to its powers under the Spending Clause. *See, e.g., New York State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 77 (2d Cir. 2019) (Title IV-E "is

13

Spending Clause legislation directed at state administration of foster care and adoption assistance services."). "Spending Clause legislation" like Title IV-E and -B "operates based on consent: in return for federal funds, the recipients agree to comply with federally imposed conditions." *Cummings*, 596 U.S. at 219 (alteration and quotation marks omitted). As a result, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* (citation omitted). Yet, as stated, the Final Rule's mandates for LGBTQI+ youth are absent from the statute. DFPS works with hundreds of providers to care for more than 17,000 foster children and its operations rely on over $430 million in federal Title IV funding. Ex. A ¶¶ 4, 12. Nationwide, nearly 391,000 minors are cared for by state or tribal foster agencies. *See* 89 Fed. Reg. 34856. If Congress intended to grant HHS authority to condition funding on federal micromanagement of foster providers regarding LGBTQI+ issues, it would have said so plainly. *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). But Titles IV-E and -B include no such mandate. Lacking clear congressional authorization, HHS cannot impose these conditions through the Final Rule.

### D. The Final Rule is arbitrary and capricious.

Agency action must address relevant issues and explain its decisions, including public comments. *U.S. Chamber of Commerce v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023). A rule is arbitrary if it ignores key issues, contradicts evidence, or relies on impermissible factors. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Final Rule fails this standard. For example, the Final Rule's overbroad retaliation definition burdens providers, deterring participation and discouraging care for LGBTQI+-identifying youth. *See* 89 Fed. Reg. 34851, 34860; Ex. A ¶¶ 15–16. HHS failed to address these disincentives, undermining the Rule's goal of increasing care for such children. By imposing onerous requirements on relatives and fictive kin, the Final Rule also conflicts with Congress's preference for such placements. *See* 42 U.S.C. § 671(a)(19); 89 Fed. Reg. 34843; Ex. A ¶ 11. These requirements will deter family placements, especially in rural areas where capacity is already strained. *See* Ex. A ¶ 14.

The Final Rule's requirement to house youth by gender identity in sex-segregated facilities

creates safety risks, shrinks congregate care capacity, and forces DFPS to abandon sex-segregated housing policies. HHS dismissed these concerns, despite public comments warning of significant safety and privacy issues. *See* 89 Fed. Reg. 34836–37; Ex. A ¶ 12. The Final Rule further forces DFPS to reassign LGBTQI+ youth to Designated Placements upon request, disrupting stable arrangements and increasing provider liability. *See* Ex. A ¶ 15.

Finally, the Final Rule fails to adequately consider the costs state agencies will incur to comply with its mandates. For example, state agencies will need to develop protocols and systems for implementing the Final Rule's new oral and written notification regimes. State agencies also face significant costs to enforce and monitor the retaliation regime, including the costs of preparing and providing materials to all foster-care providers regarding the Final Rule's procedural requirements and bases for retaliation charges. These costs strain DFPS resources, likely exceeding the funding available under Texas's legislative cycle. *See* Ex. A ¶¶ 6–8, 14.

## II.    Texas will suffer irreparable harm from the Final Rule.

Texas will suffer irreparable harm. In determining whether costs are irreparable, the key inquiry is "not so much the magnitude but the irreparability." *Texas v. EPA*, 829 F.3d at 433–34 (quotation omitted). And "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs," *id.* at 433, because "sovereign immunity would prevent the States from recovering the loss through monetary remedies," *Texas v. Becerra*, 2024 WL 3297147, at *9. As described above in the discussion on standing, the Final Rule imposes substantial compliance costs, threatens economic injury to Texas, and infringes on Texas's sovereignty. And Texas does not have the luxury of waiting. While the Final Rule gives Title IV agencies until 2026 to implement its provisions, Texas still needs urgent relief. This is because, unique among its sister States, Texas convenes its legislature every other year, meaning that the State allocates funding for a two-year budget. The Texas Legislature will open its next regular session on January 2, 2025, during which it will enact a budget that will govern funding appropriations until August 31, 2027—well after the Final Rule's implementation deadline. Ex. A

15

¶ 6. The Legislature creates the State's budget after receiving proposed budgets from its agencies. Given this urgency, DFPS has already begun undertaking internal reviews to assess the amount of compliance-related funding it will require. *Id.* ¶ 7.

### III. The balance of the equities and the public interest favor a stay of the Final Rule.

"The first two factors [for preliminary relief: likelihood of success on the merits and irreparable harm] are the most critical." *Texas v. Becerra*, 2024 WL 3297147, at *4 (citation omitted). When the government is a party, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A court therefore must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). Defendants will not be harmed by a stay of the Final Rule. And a stay against an illegal rule cannot undermine the public interest since the public has no interest in the enforcement of illegal rules. *Texas v. Becerra*, 2024 WL 3297147, at *11.

### IV. The Court should stay the Final Rule universally.

"[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party restricted and allows a court to 'set aside' an unlawful agency action," *Career Colleges & Sch. of Tex.*, 98 F.4th at 255, including "the *whole* … of an agency rule." 5 U.S.C. § 551(13) (emphasis added); *see also Texas v. Becerra*, No. 6:24-CV-211-JDK, 2024 WL 4490621, at *1 (E.D. Tex. Aug. 30, 2024) (Kernodle, J.) ("because relief under § 705 should not be party restricted, the appropriate remedy is to stay the effective date of the Final Rule for all participants"); *Fed'n of Americans for Consumer Choice, Inc.*, 2024 WL 3554879, at *17 (same).

### CONCLUSION

For the foregoing reasons, the Court should stay the Final Rule.

| | |
|---|---|
| Dated: December 6, 2024 | Respectfully submitted, |
| | |
| KEN PAXTON<br>Attorney General of Texas | /s/Ryan D. Walters<br>RYAN D. WALTERS<br>Chief, Special Litigation Division<br>Texas State Bar No. 24105085<br>ryan.walters@oag.texas.gov |
| BRENT WEBSTER<br>First Assistant Attorney General | |
| RALPH MOLINA<br>Deputy First Assistant Attorney General | KATHLEEN T. HUNKER<br>Special Counsel<br>Texas State Bar No. 24118415<br>kathleen.hunker@oag.texas.gov |
| AUSTIN KINGHORN<br>Deputy Attorney General for Legal Strategy | |
| | GARRETT GREENE<br>Special Counsel<br>Texas State Bar No. 24096217<br>garrett.greene@oag.texas.gov |
| OFFICE OF THE TEXAS ATTORNEY GENERAL<br>Special Litigation Division<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Telephone: 512-463-2100<br>Fax: 512-457-4410 | |
| | ZACHARY L. RHINES<br>Special Counsel<br>Texas State Bar No. 24116957<br>zachary.rhines@oag.texas.gov |
| | KYLE S. TEBO<br>Special Counsel<br>Texas State Bar No. 24137691<br>kyle.tebo@oag.texas.gov |
| | COUNSEL FOR STATE OF TEXAS |

### CERTIFICATE OF CONFERENCE

I certify that I conferred on December 4, 2024, via phone with Zachary Sherwood of the U.S. Department of Justice regarding the relief requested in this motion. Counsel for Defendants stated that they oppose the motion.

                                                                            /s/Ryan D. Walters<br>
                                                                            RYAN D. WALTERS

### CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2024, a true and correct copy of the above and foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

                                                                            /S/ Ryan D. Walters<br>
                                                                             RYAN D. WALTERS