UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS,<br><br>    *Plaintiff*,<br><br>v.<br><br>XAVIER BECERRA, Secretary of the United States Department of Health and Human Services, in his official capacity; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JEFF HILD, Principal Deputy Assistant Secretary for the Administration for Children and Families; ADMINISTRATION FOR CHILDREN AND FAMILIES; REBECCA JONES GASTON, Commissioner of the Administration on Children, Youth and Families, and Acting Associate Commissioner of the Children's Bureau, in her official capacity; ADMINISTRATION ON CHILDREN, YOUTH AND FAMILIES; CHILDREN'S BUREAU; and the UNITED STATES OF AMERICA,<br><br>    *Defendants*. | CIVIL ACTION NO. 6:24-CV-348-JDK |

**REPLY IN SUPPORT OF OPPOSED MOTION FOR STAY OF AGENCY ACTION**

## ARGUMENT

I. **Texas is likely to succeed on the merits.**

   A. **The Rule is contrary to law.**

   HHS insists that the Rule fits within Title IV-E and IV-B's mandates and leans heavily on the Rule's preamble to justify imposing "Designated Placements" and nonretaliation provisions under the headings of "safe and proper care." *See* ECF No. 22, Opposition to Stay Motion ("Opp'n") at 9–12, 15–17, 21, 23. This is insufficient to override the statutory language, which focuses on ensuring that foster children are placed safely and appropriately, not that States must create nondiscrimination requirements based on LGBTQI+ status. *See Shane v. Cnty. of San Diego*, 677 F. Supp. 3d 1127, 1140 (S.D. Cal. 2023) ("The case plan must generally ensure that the foster child receives 'safe and proper care' to address the needs of the child while in foster care but does not otherwise specify what constitutes such safe and proper care. 42 U.S.C. § 675(B)").

   Congress underscored its intent to address discrimination in foster care by expressly prohibiting certain classifications—race, color, or national origin—in 42 U.S.C. § 671(a)(18). That reveals that when Congress wished to bar discrimination based on a particular characteristic, it knew how. HHS's claims that it "never relied on this statutory provision when promulgating the Rule," Opp'n at 18, have nothing to do with the fact that canons of statutory construction preclude an extra-textual addition of a protected class—the fact that § 671(a)(18) omits sex, sexual orientation, and gender identity shows Congress's decision *not* to extend Title IV-E's antidiscrimination provision to those categories. The inclusion of certain protected traits excludes those unmentioned. *See United States v. Vonn*, 535 U.S. 55, 65 (2002). HHS cannot circumvent that decision by tying new mandates to general phrases like "safe" or "proper" care, especially when they implicate the kinds of social and policy judgments that Congress itself chose not to codify.

   The enumerated requirements in § 671(a) number thirty-seven discrete items. None calls for "Designated Placements" specific to a foster child's "LGBTQI+" status. The Secretary's only role here is that he *shall* approve a State's plan if it meets the statutory list. *See* 42 U.S.C. § 671(b); *see also Suter v. Artist M.*, 503 U.S. 347, 361 (1992) (§ 671(a) does not place any "requirement for

2

state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary"). Even if there were ambiguity in the phrase "safe and proper care," HHS cannot assert "transformative expansions in [its] regulatory authority" from such general language. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (citation omitted). Regulation of foster-care placements based on LGBTQI+ status carries substantial economic, political, and federalism implications.

HHS misapplies the major questions doctrine by asserting that the Rule has no "staggering" implications. Opp'n at 20. This argument ignores the many ways the Rule disrupts state foster-care systems. Far from this being a "run-of-the-mill APA case," *contra* Opp'n at 20, States must overhaul training, provider recruitment, and placement decisions while facing the loss of federal funds if they deviate from the Rule. Separation-of-powers principles undergirding the major questions doctrine also prohibit agencies from deciding issues of great political significance, or issues traditionally governed by state law, absent clear congressional authorization. *See West Virginia*, 597 U.S. at 723; *id.* at 743 (Gorsuch, J., concurring); *Mayfield v. DOL*, 117 F.4th 611, 616 (5th Cir. 2024); *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023) (applying the major questions doctrine because of the political significance of the issue). Regulation of foster-care placements based on LGBTQI+ status falls squarely into this category, at the forefront of public and political discourse. Such decisions are the type of major question that Congress itself must decide. *See Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 3658767, at *36 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.) (noting how "gender-identity" issues carry "enormous social and political significance" and represent a "major question that properly belongs to Congress"). This is especially so when the proposed exercise of power is a novel one—HHS cites no previous exercises of such authority—based on a "long-extant statute," as is here. *See All. for Fair Bd. Recruitment v. SEC*, No. 21-60626, 2024 WL 5078034, at *16 (5th Cir. Dec. 11, 2024) (en banc).

The Rule intrudes into an area "that is the particular domain of state law." *West Virginia*, 597 U.S. at 743–44 (Gorsuch, J., concurring). Family law, including foster care, has long been reserved to the States, reflecting their primary authority to regulate the domestic relations of parent and child. *See In re Burrus*, 136 U.S. 586, 593–94 (1890). By imposing sweeping federal

3

requirements on deeply sensitive and contested issues, the Rule disrupts the careful balance of federalism, intruding on a domain that has traditionally been left to the States' discretion and the diverse values of their local communities. Federalism demands that Congress use "exceedingly clear language" when it seeks to significantly alter the balance of state and federal power. *Sackett v. EPA*, 598 U.S. 651, 679 (2023). Yet the statutory provisions the Rule depends on lack such clarity, using vague phrases like "safe and proper care." HHS cannot transform such general terms into mandates with significant political, social, and financial implications. *West Virginia*, 597 U.S. at 744.

In a similar way, HHS also overlooks the substantial flexibility that Congress deliberately left to the States in the area of foster care. *See* Opp'n at 18–19. Section 671(a)(15) requires "reasonable efforts" to reunify families yet does not provide a rigid blueprint for meeting that goal—evidencing that "Congress left a great deal of discretion" to the States. *Suter v. Artist M.*, 503 U.S. at 62; *see also id*. at 360 (noting that compliance with this provision of the statute and "*other provisions*" are "within broad limits, left up to the States") (emphasis added). In the same way, States retain similar latitude under the broader statutory directive to ensure "safe and proper care," allowing each to account for local needs when training foster families and finding proper placements. *See id.; see also State of Vermont Dep't of Soc. & Rehab. Servs. v. HHS*, 798 F.2d 57, 60 (2d Cir. 1986) ("As is evident from the statute, and more particularly, its legislative history, Congress afforded the [S]tates considerable flexibility to develop administrative procedures compatible with their own unique foster care circumstances.") (citations omitted). Contrary to that statutorily conferred discretion, the Rule's mandated "Designated Placements," specialized training curricula, and open-ended retaliation clauses are rigid commands from the federal government—redefining core state judgments about how best to serve children in foster care.

The retaliation provision underscores the Rule's unwarranted expansion, penalizing providers for "failing to affirm" a child's LGBTQI+ identity. This contested ideological concept exceeds any statutory obligation to provide "safe and proper care." HHS seeks to transform unremarkable statutory phrases about "safe" and "proper" care into a broad, binding mandate that forces States to adopt LGBTQI+-specific policies and to penalize perceived "retaliation." This

contravenes the statutory text, Congress's choice to exclude sex, sexual orientation, and gender identity from Title IV-E's only antidiscrimination provision, and federalism. Because Congress gave States discretion in administering foster-care programs, and federal intrusion into family law requires a clear statement by Congress, the Rule is invalid.

### B. The Rule violates the Spending Clause.

Nor can HHS salvage the Rule by invoking the supposedly "voluntary" nature of Title IV-E and IV-B funding under the Spending Clause. Opp'n at 18–19. While Congress may set conditions for receiving federal funds, such conditions must be unambiguous, related to the program's purpose, and not coercive. *See South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). There is no "clear statement." The statutory text does not condition federal payments on a state's agreement to create or maintain "Designated Placements" or to penalize individuals for not adopting certain ideological stances regarding LGBTQI+ identity. Additionally, Title IV-E's central objective is to reimburse States for foster care, adoption, and related services aimed at children's safety and well-being—not to enforce broad anti-discrimination frameworks.

### C. The Rule is arbitrary and capricious.

HHS attempts to defend the cursory reasoning in the Rule. Opp'n at 20–22. But the Rule relies on an incorrect legal standard and makes only conclusory statements about relevant factors.

First, HHS has applied the wrong legal standard—creating a chimera by injecting anti-discrimination caselaw and legal tests into the best-interests-of-the-child standard for foster care. *See* Opp'n at 18 ("The Rule implements and clarifies *existing* statutory requirements concerning the provision of 'safe,' 'proper,' and 'appropriate' care to foster children").

That HHS is using anti-discrimination law in the Rule—despite Congress only limiting discrimination in foster care on the grounds of race, color, or national origin, 42 U.S.C. § 671(18)—is evident. First, under the heading "Nondiscrimination Provisions," the preamble admits that "retaliation is … a form of discrimination because the individual in question is being subjected to differential treatment" and cites *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) (holding

5

retaliation is a form of intentional discrimination under Title IX). 89 Fed. Reg. 34846. Based on this definition, it states that it "use[s] the term 'retaliation' in the final rule because a key goal of this provision is to ensure that children do not experience harm that might deter them from seeking or benefiting from the protections afforded by the rule." *Id.* 34846–47. And under the heading "Section 1355.22(d) Retaliation Prohibited," the preamble cites the retaliation provision of Title VI of the Civil Rights Act of 1964 in concluding that "the intent [to prevent retaliation of this type against LGBTQI+ status] is reflected in the current text of the final rule." *Id.* 34835.

Similarly, the preamble under the heading "Section 1355.22(f) Placement of Transgender and Gender Non-Conforming Children in Foster Care" contrasts a failure to place children consistent with their gender identity with "nondiscriminatory" practices and cites a Title IX case. 89 Fed. Reg. 34837 & n.32 (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)). And the preamble discusses how it uses the term "harassment" by citing the anti-discrimination provision of Title VII and cases applying it. *See* 89 Fed. Reg. 34827 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)) "Application of the legal definition of harassment must necessarily" apply to LGBTQI+ children in foster care, the preamble says, and the *Oncale* case is cited again for the standard in the Rule. 89 Fed. Reg. 34828. A decision is arbitrary and capricious if it "applies an incorrect legal standard." *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 233 (5th Cir. 2024) (citation omitted). All of the Rule is derivative of applying an anti-discrimination standard Congress denied, so the "error permeates—and therefore infects—the entire" decision. *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 779 (5th Cir. 2023).

Next, the Rule merely provides "bare acknowledgement[s]" and "conclusory statements" insufficient to satisfy APA review. *Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024). Just because the Rule "acknowledged the concern" of allowing biological males to access female-only facilities "and moved on" did "not constitute adequate agency consideration of an important aspect of a problem," *id.*, especially when it "cited other facts" (court decisions in anti-discrimination cases) "and then implicitly credited the latter without explaining why," which is "the touchstone of arbitrary and capricious agency action," *id.* Similarly conclusory is the

response to concerns about exacerbating a shortage of providers. 89 Fed. Reg. 34844.

Finally, the consideration of the costs of the notification and retaliation requirements, 89 Fed. Reg. 34858–59, merely states that the agency did "not expect them to be significant," *id.*, with no explanation. This "dismissive analysis, which dots 'i's' and crosses 't's' without actually saying anything," is not reasoned decisionmaking. *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022); *see also id.* ("after explicitly declining to quantify or at least reasonably describe the costs of this policy to the States, the agency audaciously concludes that 'any effects from implementation of priorities guidance are unlikely to be significant, and could have a net positive effect.'").

## II. Texas will suffer irreparable harm from the Rule and the Stay Motion is timely.

HHS's argument that Texas waited too long to seek a stay is contradictory. On one hand, the near eight-month period between the Rule's initial promulgation date and the stay motion cuts against irreparable harm. Opp'n at 24–25. On the other, there's no urgency because compliance with the Rule isn't required until October 2026—nearly two years from now. Opp'n at 23–24.

Preliminary relief is granted even years before laws or rules go into effect. *See Texas Bankers Ass'n v. Off. of the Comptroller*, 728 F. Supp. 3d 412, 427–28 (N.D. Tex. 2024) (Kacsmaryk, J.) (preliminary injunction against rule "with an operational start date of January 1, 2026, and reporting requirements kicking in a year later" as "[g]iven the scope of Plaintiffs' operations and the changes required by the Rule, the necessity of swift action is obvious"); *Thomas More Law Center v. Obama*, 651 F.3d 529, 536–38 (6th Cir. 2011) (finding "imminent injury" on preliminary-injunction motion "three and one-half years before the effective date"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 530, 536 (1925) (preliminary injunction granted three years before law operational).

HHS cannot have it both ways. If compliance is so far off that there's no immediate need for relief, Texas could not have needed to file earlier. HHS claims that Texas signaled a lack of urgency by engaging in unconsummated negotiations over summary judgment briefing timelines. Opp'n at 13–14, 23. HHS offers no evidence that Texas ever abandoned the need for interim relief.

DFPS's unrebutted declaration shows the immediate and mounting harms posed by the Rule. *See generally* ECF No. 19-1. And even longer delays do not bar relief, particularly where the time was used to prepare a case or engage in negotiations. *See ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 699 (N.D. Tex. 2015) (eight-month delay "caused by [plaintiff's] good faith efforts to investigate facts and law" didn't bar injunctive relief); *Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 158–59 (11th Cir. 2021) (negotiation delays don't negate irreparable harm); *Times Mirror Mags., Inc. v. Las Vegas Sports News*, 212 F.3d 157, 169 (3d Cir. 2000) (15-month delay "attributable to negotiations between the parties" did not preclude injunction).

More fundamentally, none of the cases cited by HHS concern motions for a stay. While the Rule had an "effective date" of July 1, 2024, when a rule may "take effect" is different. *See Liesegang v. Sec'y of Veterans Affairs,* 312 F.3d 1368, 1374-75 (Fed. Cir. 2002). "The ordinary meaning of 'take effect' is '[t]o be in force; to go into operation.'" *Watterson v. BATFE*, No. 4:23-CV-00080, 2024 WL 897595, at *15 (E.D. Tex. Mar. 1, 2024) (Mazzant, J.) *(*citation omitted).

The date the Rule "takes effect"—October 1, 2026—has yet to pass, so there is no unreasonable delay here. *See Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 201–02 (2d Cir. 2004) (a rule "take[s] effect" when "the rule becom[es] applicable"). The Office of the Federal Register (OFR) uses the term "effective date" for the date that rules affect the current Code of Federal Regulations. *See Federal Register Document Drafting Handbook,* at p. 2-10 (Oct. 10, 1998), https://bit.ly/4gC9T1X. This contrasts with the compliance date of a rule, which is described as "the date that the affected person must start following the rule." *Id.* at 2–11. Thus, the "effective date" of a rule describes the date by which a provision in the C.F.R. is enacted, but it is not identical to when that provision is operative on regulated parties. The latter is the most relevant for determining whether Texas has unreasonably delayed, not the promulgation or effective dates.

HHS argues that a stay "incorporates traditional equitable principles." Opp'n at 26. But "[i]n the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay is the temporary form of vacatur." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024). And courts don't "require consideration of

the various equities at stake before determining whether a party is entitled to vacatur." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024). Vacatur is not a remedy from "courts sitting in equity." *Id.* at 952 & n.102. So while a stay is issued by the same factors as a preliminary injunction, general equitable considerations do not apply. As "[a] preliminary injunction is a traditional equitable remedy," "delay in moving" for one "is often cited as a reason for denying" it, *BeatStars, Inc. v. Space Ape Ltd.*, 624 F. Supp. 3d 681, 687 (W.D. Tex. 2022); while "background equitable principles may control in those non-APA cases," they do not here. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring).

HHS also argues that because the preamble says the Rule "does not establish any standard of medical care" or "preempt any state laws regarding gender-affirming medical care for minors generally," Texas has no conflict with its laws. Opp'n at 21. But although "an agency regulation with the force of law can pre-empt conflicting state requirements," "[w]e are faced with no such regulation in this case, but rather with an agency's mere assertion" on the extent of preemption of state law in a non-binding "preamble." *Wyeth v. Levine*, 555 U.S. 555, 576–81 (2009); *Texas v. Brooks-LaSure*, No. 6:21-CV-00191, 2022 WL 741065, at *9 (E.D. Tex. Mar. 11, 2022) (Barker, J.).

In any case, the Rule's preamble does not offer assurances that the Rule will not conflict with Texas's own laws and regulations. The best HHS can offer is that "[t]he rule does not preempt state laws regarding gender-affirming medical care for minors *generally*." 89 Fed. Reg. 34852. This fails to dispel Texas's fear that it will be unable to enforce its ban on gender-transition procedures against foster providers who procure them for their charges. To do so, Texas will have to contravene the Rule's prohibition of "retaliation," since stopping or punishing providers who deliver outlawed treatments would at minimum both use information related to a child's gender identity to investigate that child's foster provider and take adverse action against foster providers for their "support" for their child's "LGBTQI+ status or identity." 89 Fed. Reg. 34860.

Facially, the binding regulation in the Rule does not exclude so-called gender affirming care from its requirement to provide access to "services that are supportive of [children's] sexual orientation and gender identity or expression." 89 Fed. Reg. 34860 (45 C.F.R. § 1355.22(b)). And

9

the Rule's preemption exception is limited to state "requirements that provide greater protection to LGBTQI+ children that this section provides." *Id.* (45 C.F.R. § 1355.22(m)). "[T]he canon of *Expressio Unius Est Exclusio Alterius* … provides that 'expressing one item of [an] associated group or series excludes another left unmentioned.'" *Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020)). By limiting the preemptive effect on state laws that are "more protective," it necessarily excludes those that are "less protective." Judge Mazzant thoroughly discussed this canon in *Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 612–14 (E.D. Tex. 2021).

Similarly, the preamble states that the Rule's requirement to place children consistent with their gender identity "does not preempt state or tribal laws regarding sex-segregated institutions," 89 Fed. Reg. 34837. However, the same section of the preamble states that this requirement is "applicable to placements in child care institutions and sex segregated facilities," reiterates that Title IV agencies "must offer the child a placement consistent with [his] gender identity." *Id.* at 34836-37. When Texas regulations require DFPS to house opposite-sex children separately, it is hard to see how DFPS can follow both the Rule and state law. *See* 26 Tex. Admin. Code § 749.3029.

The impending conflict between Texas law and the Rule will have an earlier impact than HHS suggests. The October 2026 deadline marks the *conclusion*—not the start—of DFPS's compliance efforts. To meet this deadline, DFPS must immediately begin implementing changes, including new notification and training programs, a monitoring system to prevent retaliation, and recruiting providers to ensure designated placements for such children, while facing existing provider shortages. HHS minimizes this, focusing instead on DFPS's preliminary budget planning. Opp'n at 25. Yet even *now*, compliance costs and operational overhauls constitute irreparable harm. *See Career Colleges & Sch. of Texas*, 98 F.4th 220, 235. Without immediate relief, Texas faces unrecoverable costs and risks over-appropriating funds when the Legislature finalizes the budget.

### III. The Court should stay the Rule universally and in its entirety.

HHS hints that because the Rule's effective date was July 1, 2024, it is too late to postpone it under Section 705. Opp'n at 26. This is wrong. *See Texas v. Biden*, 646 F. Supp. 3d 753, 770–71 (N.D. Tex. 2022) (Kacsmaryk, J.), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (May 25,

10

2023); *see also West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem.) (issuing stay on Feb. 9, 2016, against rule with effective date of December 22, 2015); *Career Colleges & Sch. of Texas*, 98 F.4th at 226 (on April 4, 2024, ordering stay of rule with effective date of July 1, 2023 that had passed before any relief issued); *Airlines for America v. DOT*, 110 F.4th 672 (5th Cir. 2024) (on July 29, 2024, issuing stay of rule with effective date of July 1, 2024). And arguing stays can be party-restricted, Opp'n at 26–27, HHS runs into contrary precedent. *See Texas v. Becerra*, No. 6:24-CV-211-JDK, 2024 WL 4490621, at *1 (E.D. Tex. Aug. 30, 2024) (Kernodle, J.).

Finally, HHS makes a perfunctory statement asking the Court to apply a severability clause. Opp'n at 27. The Fifth Circuit recently reaffirmed that an agency "forfeit[ed]" the argument because its brief stated only argued "in two conclusory sentences that the Rule's severability provision should enable the rest of the Rule to escape the preliminary injunction." *See Louisiana by and through Murrill v. U.S. Dep't. of Educ.*, 2024 WL 3452887, at *1 (5th Cir. July 17, 2024).

HHS made no attempt to meet its burden of establishing (1) that the Rule would "function sensibly" without key provisions, and (2) that it "would have adopted the same disposition," even if particular portions were stricken. *Texas v. United States (DACA)*, 691 F. Supp. 3d 763, 788 (S.D. Tex. 2023) (Hanen, J.). There is "substantial doubt" that it would have adopted an emasculated form of the Rule, *Balt. v. Azar*, 439 F. Supp. 3d 591, 615 (D. Md.), *aff'd*, 973 F.3d 258 (4th Cir. 2020), which, as a "comprehensive regulatory package[,] is plainly not amenable to severance," *Chamber of Com. of U.S.. v. DOL*, 885 F.3d 360, 388 (5th Cir. 2018), because its components are "intertwined," "giv[ing] rise to a substantial doubt that a partial affirmance would comport with the [agency's] intent." *Telephone & Data Sys., Inc. v. FCC,* 19 F.3d 42, 50 (D.C. Cir. 1994).

Even were the Court inclined, the scant briefing on the issue puts it in the "untenable position" of having to "parse the [triple-columned, 44-] page Final Rule [itself] to determine the practicability and consequences of a limited stay." *Murrill*, 2024 WL 3452887, at *2. That is not this Court's job, *see Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024), and it should decline the offer.

## CONCLUSION

For these reasons, the Court should stay the Rule universally and in its entirety.

Dated: December 30, 2024

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

OFFICE OF THE TEXAS ATTORNEY GENERAL
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

Respectfully submitted,

/s/Ryan D. Walters
RYAN D. WALTERS
Chief, Special Litigation Division
Texas State Bar No. 24105085
ryan.walters@oag.texas.gov

KATHLEEN T. HUNKER
Special Counsel
Texas State Bar No. 24118415
kathleen.hunker@oag.texas.gov

GARRETT GREENE
Special Counsel
Texas State Bar No. 24096217
garrett.greene@oag.texas.gov

ZACHARY L. RHINES
Special Counsel
Texas State Bar No. 24116957
zachary.rhines@oag.texas.gov

KYLE S. TEBO
Special Counsel
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

COUNSEL FOR STATE OF TEXAS

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2024, a true and correct copy of the above and foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ Ryan D. Walters
RYAN D. WALTERS