## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 6:24-cv-348-JDK |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HEALTH AND HUMAN SERVICES, | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

In 2024, the Department of Health and Human Services (HHS) imposed a nationwide rule requiring experimental and controversial treatment on our nation's most vulnerable: children in foster care.  The problem for HHS here is that the agency lacks any statutory authority to do so.

The Final Rule first creates a new category of foster children—"LGBTQI+ children"—which it defines as "children with lesbian, gay, bisexual, transgender, queer, or questioning, and intersex status or identity."  Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+ Children, 89 Fed. Reg. 34,818 (Apr. 30, 2024) (codified at 45 C.F.R. § 1355.22).  The Rule then requires that States affirm and promote these children's "LGBTQI+ status or identity" in novel ways that potentially conflict with state law—or else lose federal funding for their foster care systems.

The statutes cited by HHS, however, give the agency only limited administrative review of States' foster-care systems—not the authority to create a new category of foster children and require new and untested methods in fostering them.  In fact, the law by its terms entrusts the States to provide "safe and proper care" to foster children, which States like Texas have historically accomplished by requiring foster parents to have adequate sleeping space, agree to a nonphysical discipline policy, and permit fire, health, and safety inspections of the foster home— among other similar requirements.  *See, e.g.*, *Requirements for Foster/Adopt Families*, TEX. DEP'T OF FAM. & PROTECTIVE SERVS., https://www.dfps.texas.gov/adoption_and_foster_care/get_started/requirements.asp (last visited Mar. 12, 2025).

Texas challenged the Rule as unlawful under the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*.  The Rule, Texas argues, demands that the State "radically reshape its foster care system, imposing requirements that not only upend longstanding state authority but also jeopardize the welfare of vulnerable children in foster care."  Docket No. 19 at 2.  Texas contends that it "must now choose between surrendering the discretion that Congress entrusted to it under Title IV-E to act in the best interest of children and risking the loss of critical federal funding."  *Id.* at 3.  Specifically, Texas argues that the Rule (1) exceeds HHS's statutory authority, (2) violates the Spending Clause, and (3) is arbitrary and capricious.  *Id.* at 8–15.  Most immediately, Texas seeks an order staying the Rule under 5 U.S.C. § 705.  *Id.* at 16.

The Court **GRANTS** Texas's motion (Docket No. 19).  As explained below, Texas is likely to succeed on the merits because the Rule violates the APA, Texas is likely to suffer irreparable harm, and the balance of equities and public interest supports a stay.  Accordingly, under § 705 of the APA, the Court **STAYS** the effective date of the Final Rule pending conclusion of this proceeding.

## I.

Under Titles IV-E and IV-B of the Social Security Act, 42 U.S.C. §§ 670–679c, 621–629m, the federal government provides billions of dollars in financial assistance annually to state-run child welfare agencies to offset the costs of providing foster care, adoption assistance, and related services.  This federal funding, as is typical, comes with conditions.  Enacted in 1980 pursuant to Congress's spending power, Title IV-E enumerates specific requirements States must satisfy to receive federal funding for foster care services.  States must submit a "state plan" to be approved by the Secretary of HHS.  42 U.S.C. § 670.  The state plan must satisfy an exhaustive list of thirty-seven enumerated requirements set forth in § 671(a).  *Id.* § 671(a)(1)–(37).  Upon satisfying the § 671(a) requirements, the administrative oversight arguably ends:  the state plan "shall" be approved by the Secretary.  *Id.* § 671(b).

Several § 671(a) requirements are relevant here.  A state plan must include a "case plan" and "case review system" for each child.  *Id.* § 671(a)(16).  The "case plan" must ensure the child receives "safe and proper care."  *Id.* § 675(1)(B).  And a "case review system" must include a procedure to ensure that each child is placed in a "safe setting" that is "most appropriate" and "consistent with the best interest and special needs of the child."  *Id.* § 675(5)(A).  Further, a state plan must include standards to

ensure children receive "quality services that protect the safety and health of the children." *Id.* § 671(a)(22). A state plan must also certify that prospective foster parents "will be prepared adequately with the appropriate knowledge and skills to provide for the needs of the child." *Id.* § 671(a)(24).

The Secretary of HHS is tasked with reviewing and approving state plans for "substantial conformity" with (1) the enumerated state plan requirements, (2) implementing regulations promulgated by the Secretary, and (3) the relevant approved state plans. *Id.* § 1320a-2a(a). The Secretary is also authorized to "make and publish such rules and regulations . . . as may be necessary to the efficient administration of the functions with which [he] is charged under" the Social Security Act. *Id.* § 1302(a). Consistent with this authority, the Secretary has long promulgated rules that institute a system to review States' compliance with Titles IV-E and IV-B, 45 C.F.R. §§ 1355.31–37, or establish State reporting requirements, *id.* §§ 1355.41–45.

In 2024, HHS promulgated the Final Rule purportedly under this statutory framework, first creating the "LGBTQI+ children" category and then imposing several new requirements on States for fostering such children. For instance, the Rule mandates that "designated placements" be available for all "LGBTQI+ children" who "request or would benefit from such a placement." 45 C.F.R. § 1355.22(b)(1). A designated placement must (1) "[c]ommit to establish an environment that supports the child's LGBTQI+ status or identity"; (2) "[b]e trained with the appropriate knowledge and skills to provide for the needs of the child related to the child's self-

4

identified sexual orientation, gender identity, and gender expression"; and (3) "[f]acilitate the child's access to age- or developmentally appropriate resources, services, and activities that support their health and well-being." *Id.* § 1355.22(b)(1)(i)–(iii). The "age- or developmentally appropriate resources" for "LGBTQI+ children" sweeps broadly to include any services that are "supportive of their sexual orientation and gender identity or expression." *Id.* § 1355.22(e). The studies cited by the Rule make clear: "supportive" services include medical procedures such as puberty blockers, gender-affirming medications, and medically appropriate surgeries. *See* 89 Fed. Reg. at 34,823 n.28 (citing CHILD WELFARE INFORMATION GATEWAY, PROTECTING THE RIGHTS AND PROVIDING APPROPRIATE SERVICES TO LGBTQIA2S+ YOUTH IN OUT-OF-HOME CARE (2023), https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/LGBTyouth (favorably citing States that provide "gender-affirming care" deemed "medically necessary, including but not limited to, puberty blockers, gender-affirming medications, and medically appropriate surgeries")); *id.* at 34,823 n.29 (citing 2022 HHS guidance stating that "providing gender-affirming medical care is in the best interest of children and youth who need it").

The Rule then prohibits "retaliation" against any "LGBTQI+ child," which is broadly defined to include, among other things, any "[a]ttempts to undermine, suppress, change, or stigmatize a child's sexual orientation or gender identity or expression through 'conversion therapy,'" "[use] information about the child's LGBTQI+ status or identity to initiate or sustain a child protection investigation," or

"[take] action against" caregivers "because they have supported a child's LGBTQI+ status or identity."  45 C.F.R. § 1355.22(d)(2)(ii), (v), (vi).  And the Rule requires a process by which "LGBTQI+ children" can report such "retaliation" or other "concerns about a placement."  *Id.* § 1355.22(c).

Finally, in the context of sex-segregated facilities, the Rule requires that "transgender and gender non-conforming children in foster care" be offered placement "consistent with their gender identity."  *Id.* § 1355.22(f); *see* 89 Fed. Reg. at 34,837 (agreeing this requirement "is most applicable to placements in child care institutions and sex-segregated facilities").

The Final Rule took effect on July 1, 2024.  The compliance deadline for States is October 1, 2026.  45 C.F.R. § 1355.22(l).  Texas filed this lawsuit on September 24, 2024, and moved for a stay of the Rule on December 6, 2024.  The Court held oral argument on Texas's motion on January 16, 2025.

## II.

Texas seeks a stay of the Final Rule's effective date.

The APA provides that "the reviewing court" may issue equitable relief "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705; *see also, e.g.*, *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("We have the power to stay the agency's action 'to the extent necessary to prevent irreparable injury.'" (quoting § 705)).  Courts grant relief under § 705 based on the traditional four equitable factors for injunctive relief: (1) plaintiff's likelihood of success on the merits; (2) the threat of irreparable harm without a stay; (3) "whether other interested parties will be irreparably injured by a

stay"; and (4) the public interest. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1135 (5th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors are the most critical." *Id.* (quoting *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020)). Once a plaintiff has made a showing under the first two factors, the third and fourth factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

As discussed below, each factor weighs in favor of granting a stay here.

## A.

Texas argues it is likely to succeed on the merits because HHS lacked statutory authority to promulgate the Final Rule and because the Rule is contrary to law. Docket No. 19 at 8–13; Docket No. 25 at 2–5. The Court agrees.[1] Specifically, the Court finds that the Final Rule violates the APA in two independent ways: (1) HHS lacked rulemaking authority to issue the Final Rule and (2) the Final Rule conflicts with the text of Title IV-E.

## 1.

HHS fails to identify "explicit Congressional authority" justifying the Final Rule. *Inhance Techs., LLC v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024) (quoting *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019)).

The APA instructs courts to "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). "It is axiomatic that an administrative agency's power to promulgate legislative

---

[1] Because Texas demonstrates a likelihood of success on its first claim, the Court need not reach the Spending Clause or arbitrary and capricious claims.

regulations is limited to the authority delegated by Congress." *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)), *cert. granted*, 144 S. Ct. 1390 (2024). "Agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Inhance Techs.*, 96 F.4th at 893 (cleaned up); *see also Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 615 (E.D. Tex. 2021) ("[B]efore promulgating rules or regulations pursuant to a statute, agencies must demonstrate a clear 'textual commitment of authority' in the language Congress enacted." (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))).

"How do we know when an agency has exceeded its statutory authority? Simple: the plain language of the statute tells us so. Therefore, we start, as we always do, with the text." *VanDerStok*, 86 F.4th at 188 (cleaned up). "Only where the statutory text shows that [an agency] has clear congressional authorization to enact a regulation can such a regulation withstand judicial scrutiny." *Id.* (cleaned up); *see also SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 363 (2018) ("Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer.").

HHS fails to point to explicit Congressional authority justifying the Final Rule. HHS first cites 42 U.S.C. § 1320a-2a(a), which delegates authority to the Secretary to "promulgate regulations for the review of" State programs "to determine whether such programs are in substantial conformity with" federal law. But that provision

8

says nothing about HHS's authority to promulgate rules altering, interpreting, or expanding upon federal law, including States' requirements under § 671(a). HHS next cites 42 U.S.C. § 1302(a), which authorizes the Secretary to issue rules "as may be necessary to the efficient administration of the functions with which" the Secretary is charged. This provision, however, is nothing more than a "housekeeping statute" that does not authorize HHS to make the kind of substantive rule like the Final Rule here. *E.g.*, *Ryan, LLC v. FTC*, 2024 WL 3879954, at *9 (N.D. Tex. Aug. 20, 2024) (explaining that a similar "housekeeping statute" does not authorize substantive rulemaking).

In fact, HHS has never interpreted its rulemaking authority the way it now urges this Court to do. As HHS conceded at the hearing, the agency has never—in more than forty years since Title IV-E was enacted—promulgated a rule interpreting "safe and proper care" or any other similar rule. HHS, moreover, provides no instance where the agency has created a category of foster children with special requirements or imposed additional, substantive obligations on States to ensure compliance with Titles IV-E and IV-B. Indeed, the only example of rulemaking identified by HHS is the agency's "Child and Family Services Review process," under which States' compliance with Title IV-E and IV-B programs are assessed. *See* Docket No. 22 at 4–5 (referencing 45 C.F.R. §§ 1355.31, *et seq.*). While the lack of historical precedent is not dispositive, "[i]t is telling that [the agency], in its half century of existence, has never before adopted a broad public health regulation of this kind." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); *Ryan*, 2024 WL 3879954, at *9 (holding that an agency

lacked statutory authority to promulgate a rule in part because "from 1978 to the announcement of the [Final Rule], the [agency] did not promulgate a single *substantive* rule under" the relevant statutory provision); *cf. Biden v. Missouri*, 595 U.S. 87, 94 (2022) (holding that broad statutory language delegated the requisite rulemaking authority to a federal agency in part because of the "longstanding practice" of similarly substantive regulations).   In sum, the "lack of historical precedent" coupled with "the breadth of authority" the Final Rule claims is a "telling indication" that the Final Rule extends beyond HHS's "legitimate reach."  *NFIB*, 595 U.S. at 119 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)).

A cursory review of Title IV-E, moreover, confirms that HHS lacks the authority it seeks here.  Title IV-E contemplates that HHS's role is limited to reviewing state plans and administering the program.  For example, the Secretary is tasked with approving state plans that comply with statutory requirements, disbursing funds, offering technical assistance, and collecting and publishing data. *See* 42 U.S.C. § 671(b) ("The Secretary *shall* approve *any plan* which complies with [§ 671(a)]." (emphases added)); *id.* § 674; *id.* § 676(a) (explaining "[t]he Secretary may provide technical assistance to the States to assist them" in developing programs, shall "evaluate the programs," and shall collect and publish data pertaining to foster care in this country).  Nowhere does the text of Title IV-E purport to delegate to HHS authority to promulgate a rule that dramatically expands States' obligations under § 671(a).

HHS repeatedly argues that the Final Rule simply ensures that "LGBTQI+ foster youth" receive their statutory guarantee of "safe and proper care." *E.g.*, Docket No. 22 at 13. Texas and others would disagree. *See* Docket No. 19 at 2 (stating that the Rule is "in direct contravention of biological realities" and will "jeopardize the welfare of vulnerable children in foster care"); Ryan T. Anderson & Robert P. George, *Physical Interventions on the Bodies of Children to "Affirm" their "Gender Identity" Violate Sound Medical Ethics and Should be Prohibited*, PUBLIC DISCOURSE (Dec. 8, 2019), https://www.thepublicdiscourse.com/2019/12/58839 (last visited Mar. 12, 2025) (arguing that "[m]edical professionals certainly should not make radical interventions into the bodies of young people on the basis of a misguided ideology of identity"). But in any event, Title IV-E entrusts States to provide "safe and proper care," and it nowhere provides HHS a legislative license to define or establish what constitutes safe and proper care for certain children. *See TMA v. HHS*, 110 F.4th 762, 775–76 (5th Cir. 2024) (holding an agency lacked rulemaking authority to expand statutory requirements regarding proper arbitration procedures because the statutorily empowered decisionmaker was the independent arbitrator—not the agency); *cf. Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 439 (5th Cir. 2021) (finding an agency had authority to promulgate rules for the "public interest" because, in addition to a general rulemaking provision, the agency was delegated power to "define" and "establish" rules "consistent with the public interest" (cleaned up)). And to the extent that the statute is silent as to *who* decides what is "safe and proper care," the Court declines to interpret that silence as a gap for the agency to fill. *See*

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020) (rejecting the "nothing-equals-something argument" that Congressional silence leaves a gap for the agency to fill); *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015) (explaining that "agencies would enjoy virtually limitless hegemony" if courts were "to presume a delegation of power absent an express withholding of such power" (citation omitted)); *Iancu*, 584 U.S. at 368 ("We need not and will not invent an atextual explanation for Congress's drafting choices when the statute's own terms supply an answer.").

HHS's interpretation of its rulemaking authority runs into another problem: the major questions doctrine. It's highly unlikely that Congress would authorize HHS to issue a rule with such sweeping social policy implications by using the statutory language here. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (explaining that the major questions doctrine is a principle of statutory interpretation providing a "reason to hesitate before concluding that Congress meant to" delegate to an agency authority to resolve matters of great importance through suspect language (cleaned up)); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring) (explaining that the major questions doctrine is a common sense "tool for discerning— not departing from—the text's most natural interpretation"). Courts should be "reluctant to read into ambiguous statutory text" an agency's claimed authority to: (1) resolve a matter of great political significance; (2) resolve a matter of great economic importance; or (3) intrude into an area that is the domain of state law. *West*

*Virginia*, 597 U.S. at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 616 (5th Cir. 2024).

And here, the Final Rule addresses both a matter of great political significance and intrudes into an area that is the domain of state law. *See Texas v. Cardona*, 2024 WL 3658767, at *36 (N.D. Tex. Aug. 5, 2024) (whether an agency could force schools to accept "a person's subjective and potentially ever-changing gender identity regardless of biological sex" was a "major question that properly belongs to Congress" given "the enormous social and political significance associated with transgenderism and gender-identity issues"); *see also In re Burrus*, 136 U.S. 586, 593–94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States."); *Reno v. Flores*, 507 U.S. 292, 310 (1993) (explaining that States have "special proficiency" in the field of domestic relations, including child custody). Accordingly, even if HHS's statutory argument were "plausible," the agency certainly fails to point the Court to "clear congressional authorization" for the Final Rule. *See West Virginia*, 597 U.S. at 723; *see also Sackett v. EPA*, 598 U.S. 651, 679 (2023) (requiring "Congress to enact exceedingly clear language if it wishes to significantly alter the balance of federal and state power" (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622–23 (2020))).

Accordingly, the Court finds that HHS lacks explicit Congressional authority justifying the Final Rule.

### 2.

The Final Rule also conflicts with the text of Title IV-E.

13

The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). An agency rule that is inconsistent with the governing statute and that "rewrites clear statutory terms" must be held "'unlawful and set aside' on this basis alone." *TMA v. HHS*, 587 F. Supp. 3d 528, 543 (E.D. Tex. 2022) (quoting *Util. Air Regul. Grp.*, 573 U.S. at 328). It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328. The Court must therefore interpret the relevant statute—Title IV-E.

In doing so, the Court applies the "fundamental canon of statutory construction" that words "should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up); *Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 563 (5th Cir. 2024) ("Where a statute leaves terms undefined, we accord those terms their 'ordinary, contemporary, common meaning.'" (citation omitted)); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (explaining that "the whole point of having written statutes" is that "every statute's meaning is fixed at the time of enactment" (citation omitted)); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–77 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."). The Court, moreover, must examine "the language and design of the statute as a whole." *E.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

The operative text here is Title IV-E's mandate that state plans provide foster children "safe and proper care." 42 U.S.C. § 675(1)(B). Title IV-E, enacted in 1980, originally included the language "proper care." In 1997, Congress amended the language to "safe and proper care." Whatever "safe and proper care" meant at the time, the Final Rule must be consistent with its original meaning. Put another way, the Rule's predominate mandate regarding foster children identified by HHS as "LGBTQI+" must be consistent with "safe and proper care" as that term was understood when Title IV-E was enacted. *See VanDerStok*, 86 F.4th at 189 (explaining that "the meanings of statutes do not change with [modern] times").

The problem for HHS is that the agency effectively concedes that the Rule is inconsistent with that meaning. At oral argument, HHS admitted that the Final Rule addresses a "relatively new" issue; that the expectations of treatment for children "identifying as LGBTQI+" are "very different" now than when Title IV-E was enacted; and that such children were likely not front of mind for Congress at the time. The Final Rule confirms as much, citing almost exclusively academic reports issued only very recently, with the oldest report dated 2009. 89 Fed. Reg. at 34821–23 nn.1–29. And, indeed, even today it is very much disputed that the "safe and proper care" of a child would include affirming the child's "gender identity" when it's inconsistent with the child's biological sex. *See* Anderson & George, *supra* (arguing "'gender affirmation' procedures violate sound medical ethics, that it is profoundly unethical to reinforce a male child in his belief that he is not a boy (or a female child in her belief that she is not a girl), and that it is particularly unethical to intervene in the

15

normal physical development of a child to 'affirm' a 'gender identity' that is at odds with bodily sex").  At the very least, the new and experimental nature of "gender affirming care" on children demonstrates that it was not part of the original understanding of "safe and proper care."  *See id.* (explaining that there "is not a single long-term prospective study of the long-term consequences of blocking an otherwise physically healthy child from undergoing normal pubertal development").  In short, "safe and proper care" for foster children as that term is used in Title IV-E does not include providing the means to facilitate, support, and affirm a child's perceived sexual orientation or claimed gender identity or status.  HHS offers no evidence to the contrary.

Another § 671(a) requirement, moreover, confirms that the Final Rule is inconsistent with the term "safe and proper care" in Title IV-E.  States are statutorily prohibited from denying the opportunity to become a foster parent or delaying or denying the placement of a foster child "on the basis of the race, color, or national origin."  42 U.S.C. § 671(a)(18).  Notably absent from § 671(a)'s anti-discrimination requirement is anything related to sex.  Race, color, and national origin belong to a commonly associated group of characteristics in which sex is sometimes included.  *See, e.g.*, 42 U.S.C. § 2000e-2(a) (prohibiting employment discrimination on the basis of "race, color, religion, sex, or national origin").  The exclusion of sex (much less sexual orientation or "gender identity") suggests that Congress intended to exclude it.  *See* SCALIA & GARNER, READING LAW 107 ("The expression of one thing implies the exclusion of others.").  Thus, reading "safe and proper care" in the context of this

exclusion further confirms that the term is inconsistent with the Final Rule, which draws lines based solely on sex, sexual orientation, and "gender identity." *See United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (explaining that statutory text "should never be divorced from context" (citation omitted)); *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006) (stating that courts "must read the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous").

HHS's interpretation of "safe and proper care" is untenable.  HHS insists that "safe and proper care" requires that States provide for "LGBTQI+ foster youth" exactly as outlined in the Final Rule. *See* Docket No. 22 at 14.  But the agency entirely fails to engage with the meaning of the text when enacted, as required in this circuit. *See VanDerStok*, 86 F.4th at 189.  Nor does the Court owe any deference to HHS's mere assertion that the Final Rule falls within a permissible interpretation of "safe and proper care." *See Loper Bright*, 603 U.S. at 412 ("*Chevron* is overruled.  Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").  And common sense makes clear that Congress did not delegate to HHS the authority to compel States to support and affirm "LGBTQI+ foster children" under a general statutory guarantee of "safe and proper care." *See Texas v. Becerra*, 2024 WL 3297147, at *8 (E.D. Tex. July 3, 2024) (staying an agency rule because the Court was "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion" (citation omitted)), *modified on reconsideration*,

2024 WL 4490621 (E.D. Tex. Aug. 30, 2024); *Biden v. Nebraska*, 143 S. Ct. at 2379 (Barrett, J., concurring) ("Context also includes common sense, which is another thing that 'goes without saying.'"); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (explaining that Congress does not "hide elephants in mouseholes").

The Court will not permit HHS's unlawful attempt to rewrite or expand the statutory text approved by Congress to suit its own sense of how the statute should operate. *See Util. Air Regul. Grp.*, 573 U.S. at 328; *VanDerStok*, 86 F.4th at 189 (finding an agency's expansion of a statutory term beyond its ordinary meaning at the time of enactment, after "almost fifty years of uniform regulation," was "an impermissible extension of the statutory text approved by Congress"). Accordingly, the Court finds that the Final Rule conflicts with the text of Title IV-E.[2]

\* \* \*

Because the Final Rule likely violates the APA for at least two independent reasons, the first factor weighs in favor of a stay.

## B.

To obtain a stay, Texas must also demonstrate a substantial threat that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat'l*

---

[2] The Court's analysis focuses on the statutory language of "safe and proper care." But HHS cites other snippets of statutory text in an attempt to justify the Final Rule. *See* 42 U.S.C. § 675(5)(A) (each child must be placed in a "safe setting" that is "most appropriate" and "consistent with the best interest and special needs of the child"); *id.* § 671(a)(22) (plan must ensure "quality services" protecting child's "safety and health"); *id.* § 671(a)(24) (foster parents must be equipped with "appropriate knowledge and skills to provide for the needs of the child"). The Court does not individually address each phrase because the analysis is identical. Namely, HHS fails to show that requiring "LGBTQI+ children" be placed in environments that will facilitate and support their claimed "gender identity" or "sexual orientation" is consistent with the ordinary meaning of any of the statutory text when enacted.

*Res. Def. Council*, 555 U.S. 7, 20 (2008). For an injury to be sufficiently "irreparable," Texas need only show that the alleged injury "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (citation omitted). "Where, as here, 'the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for preliminary [relief].'" *Texas v. Becerra*, 2024 WL 3297147, at *8 (quoting *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997)). Texas meets its burden for several reasons.

The Final Rule imposes substantial compliance costs on Texas. Texas must account for these significant new burdens, which include recruiting a network of statewide providers willing to be a "designated placement," implementing new rules and policies with respect to "LGBTQI+ foster children," technological changes, and expanding training and monitoring of all caseworkers and contractors. Docket No. 19-1 ¶ 10. Texas represents that these changes will cost the State millions of dollars. *Id.* Already, the substantial nature of change is forcing Texas to invest significant time to comply with the Rule. *Id.* ¶ 7. This alone constitutes irreparable harm in the form of unrecoverable compliance costs. *See Texas v. EPA*, 829 F.3d at 433 ("Indeed 'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'" (citation omitted)); *Wages & White Lion*, 16 F.4th at 1142 (same).

It gets worse for Texas. The Texas Department of Family and Protection Services (DFPS)—the Texas agency responsible for overseeing the State's foster care system—must prepare and propose a budget to the Texas Legislature for the

increased funding needed to fully comply with the Final Rule.  Docket No. 19-1 ¶ 6.
The Legislature is currently in session during which it will enact a budget governing
funding appropriations from September 2025 through August 2027.  *Id.*  The
Legislature will not convene again until 2027.  *Id.*  Absent immediate relief, DFPS
must account for the significant expenditures in its budget now.  The alternative is
to not budget for the Final Rule and risk losing federal funding.  But Texas receives
more than $432 million annually from the Titles IV-E and IV-B program.  *Id.* ¶ 4.
Thus, to avoid irreparable compliance costs, Texas would create a new harm of lost
federal funding.  *See Texas v. Becerra*, 2024 WL 3297147, at *9 (holding that lost
federal funding for refusal to comply with an agency rule is "both substantial and
irreparable").  And under both scenarios, the losses would be irreparable because
sovereign immunity would prevent Texas from recovering them through monetary
remedies.  *Wages & White Lion*, 16 F.4th at 1142; *Texas v. EPA*, 829 F.3d at 434.

Finally, the Rule likely conflicts with Texas law.  For example, Texas prohibits
providing to minors several medical procedures for "the purpose of transitioning a
child's biological sex" or "affirming the child's perception of the child's sex" if
"inconsistent with the child's biological sex."  *See* Tex. Health & Safety Code
§ 161.702; Docket No. 19-1 ¶¶ 16–17 (noting that such procedures may constitute
child abuse under Texas law).  These prohibitions are inconsistent with the Final
Rule, which requires that "LGBTQI+ children" receive an environment that will
"support the child's LGBTQI+ status or identity" and "facilitate" the child's access to
"age- or developmentally appropriate services that are supportive of their sexual

orientation and gender identity or expression." 45 C.F.R. § 1355.22(b)(1)(i)–(iii), (e).

Nor could DFPS investigate potential child abuse or prohibited medical procedures without violating the Final Rule's retaliation provisions, which bar any attempt at "conversion therapy," the restriction of a "LGBTQI+ child's" access to "age- or developmentally appropriate materials," the disclosure of a child's perceived "LGBTQI+ status or identity" in a way that causes harm or risk to the child, using information about the child's claimed "LGBTQI+ status or identity" to initiate or sustain a child protection investigation, or taking action against caregivers who support a child's purported "LGBTQI+ status or identity." *Id.* § 1355.22(d)(2)(ii)–(vi). This conflict between Texas law and the Final Rule constitutes irreparable harm. *See Texas v. Becerra*, 2024 WL 3297147, at *10 (holding that irreparable injury occurs where a federal agency interferes with the enforcement of state law) (collecting cases); *Wyeth v. Levine*, 555 U.S. 555, 576 (2009) (recognizing that "an agency regulation with the force of law can pre-empt conflicting state requirements").

HHS's arguments that no irreparable harm exists are unpersuasive. First, HHS asserts that any compliance costs incurred by Texas will not be realized until much closer to the Final Rule's implementation date. *See* Docket No. 22 at 22. But the Rule itself belies the agency's argument by repeatedly acknowledging the substantial compliance required by the Rule and referring to the "two-year ramp-up period" necessary for States to comply. *See* 89 Fed. Reg. at 34,841 ("We acknowledge that [State] agencies will need time to come into compliance with these provisions, and this final regulation provides approximately two Federal fiscal years for

implementation."); *id.* at 34,844 (noting "that the rule provides a two-year ramp up period" in response to comments concerned about shortage of providers); *id.* at 34,854 (acknowledging the "cost to implement changes made by this rule" because "a majority of states and tribes would need to expand their efforts to recruit and identify providers and foster families" that satisfy the "designated placement" requirements, and that the "cost would vary depending on [a state] agency's available resources to implement the rule").  Further, as noted above, DFPS must submit a budget soon to the Texas Legislature to ensure it receives funding enabling it to comply with the Rule or else risk loss of federal funding.

HHS further argues that the Final Rule does not conflict with Texas law.  HHS cites the Final Rule's preamble stating that it "does not establish any standard of medical care" or preempt any state laws "regarding gender-affirming medical care for minors generally."  Docket No. 22 at 21 (citing 89 Fed. Reg. at 34,836, 34,852).  But "while the preamble can inform the interpretation of the regulation, it is not binding and cannot be read to conflict with the language of the regulation itself."  *Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019).  And the Final Rule's codified preemption language tells another story.  The Rule's provision titled "No effect on more protective laws or policies" states, "Nothing in this section shall limit any State, Tribe, or local government from imposing or enforcing, as a matter of law or policy, requirements that provide *greater protection* to LGBTQI+ children than this section provides."  45 C.F.R. § 1355.22(m) (emphasis added).  By explicitly stating that the Rule does not preempt more protective laws for "LGBTQI+

children," the clear implication is that the Rule preempts less protective laws such as Texas's.  *See* SCALIA & GARNER, READING LAW 107 ("The expression of one thing implies the exclusion of others.").

Accordingly, the second factor weighs in favor of a stay.

## C.

The third and fourth factors require the Court to weigh the harms and public interest in granting or denying Texas's requested stay.  Because these "factors merge when the Government is the opposing party," the Court considers them together.  *Nken*, 556 U.S. at 435.

The injuries likely to occur absent a stay easily outweigh any harm in granting Texas's request.  Texas has shown that without relief, it will be placed in an untenable position of choosing between incurring substantial compliance costs or losing federal funding that would not be restored, if at all, absent a stay.  *See Texas v. Becerra*, 2024 WL 3297147, at *11.  And HHS will not be harmed by a stay of unlawful agency action.  *See Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (finding alleged compliance costs outweighed an agency's interest in perpetuating "unlawful agency action"); *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024) (explaining that neither the government nor the public "has any interest in enforcing a regulation that violates federal law" (citation omitted)).

The public interest, likewise, "always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve."  *Camacho v. Tex. Workforce Comm'n*, 326 F. Supp. 2d 794, 802 (W.D. Tex. 2004) (quoting *Finlan v. City of Dallas*, 888 F. Supp. 779, 791 (N.D. Tex. 1995)).  As explained above, the

Final Rule likely exceeds the scope of HHS's authority and violates federal law. The public interest in a stay thus outweighs the agency's interest in the freedom to implement its own policies. *See Wages & White Lion*, 16 F.4th at 1143 ("[T]here is generally no public interest in the perpetuation of unlawful agency action." (quoting *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021))).

In short, "the government/public-interest analysis collapses with the merits" analysis because the Court has concluded that the Final Rule violates the APA. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 251 (5th Cir. 2023), *rev'd and remanded on other grounds*, 602 U.S. 367 (2024); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013) (Jackson, J.) (explaining that "public interest arguments" are "derivative of . . . merits arguments and depend in large part on the vitality of the latter"). It follows that HHS and the public will not be injured by a stay temporarily vacating a federal regulation that violates the APA.

Accordingly, the third and fourth factors weigh in favor of a stay.

## III.

Having determined that a stay is necessary under 5 U.S.C. § 705, the Court considers its proper scope. Section 705 is instructive: "[T]o the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Cf.* § 706 (requiring that a reviewing court "shall" "hold unlawful and set aside agency action" that violates the APA). The permissive language of § 705 grants Court considerable discretion in crafting relief.

The stay should not be limited to the parties.  "Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited" to the parties before the Court.  *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).  Rather, "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."  *Id.*  "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Id.* (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1173 (2020) ("The term 'set aside' means invalidation—and an invalid rule may not be applied to anyone." (footnote omitted)).

The provisions of the Final Rule challenged here are unlawful as to all participants, not just Texas.  *See Career Colls.*, 98 F.4th at 255 ("The almost certainly unlawful provisions of the Rule that CCST challenges apply to all Title IV participants and are thus almost certainly unlawful as to all Title IV participants."); *Texas v. Becerra*, 2024 WL 4490621, at *1 (E.D. Tex. Aug. 30, 2024).  This is especially true where, as here, the Rule prescribes "uniform federal standards."  *See Career Colls.*, 98 F.4th at 255.  Accordingly, "because relief under § 705 should not be party restricted, the appropriate remedy is to stay the effective date of the Final Rule for all participants."  *Texas v. Becerra*, 2024 WL 4490621, at *1.

HHS's argument that the Final Rule could be severed is insufficient.  In a single paragraph, HHS argues that the Final Rule's severability clause applies to preserve unchallenged provisions of the Rule.  *See* Docket No. 22 at 25.  But Texas challenges the Rule in its entirety, so there are no unchallenged provisions.  *See* Docket No. 25 at 11.  And in any event, HHS's cursory argument is insufficient.  *See Texas v. EPA*, 829 F.3d at 435 (staying an agency rule in its entirety because the agency offered only a "cursory comment" that relief should be narrowly tailored and "neither party . . . briefed how [the court] might craft a limited stay"); *Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*, 2024 WL 3452887, at *2 (5th Cir. July 17, 2024) (noting the "untenable position" the court was in "[w]ith no briefing or argument below on the consequences of a partial preliminary injunction" requiring the court to "parse the 423-page Rule ourselves to determine the practicability and consequences of a limited stay").

HHS also asserts that because the Final Rule is already in effect, there is no "effective date" for the Court to "postpone," rendering § 705 "inapposite."  Docket No. 22 at 24.  But that's wrong.  "Whether the effective date of [agency action] has passed is irrelevant to this Court's ability to issue a Section 705 stay." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (noting that "[c]ourts—including the Supreme Court—routinely stay already-effective agency action under Section 705").  Whereas an agency may only "postpone the effective date of action taken by it, pending judicial review," a federal court has broader power to "issue all necessary and appropriate process to postpone the effective date of an agency action *or to*

*preserve status or rights pending conclusion of the review proceedings.*"  *Id.* (quoting 5 U.S.C. § 705 (emphasis added)).  "Just as vacating an agency action 'does nothing but re-establish the status quo absent the unlawful agency action,' staying an agency action under Section 705 (even after the effective date) restores the same status quo *ex ante.*"  *Id.* (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)).  Accordingly, the Court may stay the Final Rule irrespective of its effective date.

## IV.

For the reasons stated above, Texas's motion (Docket No. 19) is **GRANTED**.

Accordingly, it is hereby **ORDERED** that the Final Rule entitled "Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+ Children", 89 Fed. Reg. 34,818 (Apr. 30, 2024), and its corresponding regulation codified at 45 C.F.R. § 1355.22, are **STAYED** pending conclusion of this proceeding.

So **ORDERED** and **SIGNED** this **12th** day of **March, 2025.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE